Lyla BENEDICT *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 05-1373                                    242 S.W.3d 305

Court of Appeals of Arkansas
Opinion delivered November 1, 2006

[Rehearing denied December 6, 2006.]

*Dale Casto*, for appellant.

*Diane Warren*, attorney ad litem for the minor children.

No response from Arkansas Dep't of Human Servs.

WENDELL L. GRIFFEN, Judge. In an order filed May 25, 2005, the Washington County Circuit Court terminated Lyla Benedict's parental rights to her children: G.B. (born August 31, 1998), T.B. (born November 23, 2001), and D.B. (born March 26, 2004). Appellant appeals from the termination order, contending that the circuit court erred in finding that it was in the children's best interests to terminate her parental rights. She also argues that the circuit court erroneously allowed hearsay testimony.

We hold that the circuit court clearly erred in finding that termination of appellant's parental rights was in her children's best interests. Accordingly, we reverse the order terminating her parental rights.[1]

## Standard of Revew

An order terminating parental rights must be based upon a finding by clear and convincing evidence that termination of a parent's rights is in the best interest of the children, considering the likelihood that the children will be adopted if the parent's rights are terminated and the potential harm caused by returning the children to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A) (Supp. 2005). The court must also find one of the grounds outlined in § 9-27-341(b)(3)(B). In this case, the court based its termination order on subsections (b)(3)(B)(i) and (vii):[2]

> (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.
>
> . . . .
>
> (vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity . . . to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.
>
> (b) The department shall make reasonable accommodations in accordance with the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., to parents with disabilities in order to allow them meaningful access to reunification and family preservation services.

---

[1] The circuit court also terminated the parental rights to G.B.'s father and D.B.'s putative father. Those dispositions are not relevant to this appeal. Accordingly, information about those two individuals are not recounted here.

[2] The circuit court did not cite the Arkansas Code provisions in its order, and appellant only cites subsection (b)(3)(B)(i) in her argument.

(*c*) For the purposes of this subdivision (b)(3)(B)(vii), the ability or incapacity to remedy or rehabilitate includes, but is not limited to, mental illness, emotional illness, or mental deficiencies[.]

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Causer v. Arkansas Dep't of Human Servs.*, 93 Ark. App. 483, 220 S.W.3d 270 (2005). It is not a challenge to find a case stating that "a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment." *Troxel v. Granville*, 530 U.S. 57, 77 (2000) (Souter, J., concurring) (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Parham v. J.R.*, 442 U.S. 584 (1979); *Quilloin v. Walcott*, 434 U.S. 246 (1978); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of a child. *Causer v. Arkansas Dep't of Human Servs.*, *supra*. A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. *Id.* This standard of proof reduces the possibility that a parent's rights are terminated based on "a few isolated instances of unusual conduct or idiosyncratic behavior" and "impresses the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate terminations will be ordered." *Santosky*, 455 U.S. at 764-65 (internal quotations omitted).

We do not reverse the circuit court's finding of clear and convincing evidence unless that finding is clearly erroneous. *Causer v. Arkansas Dep't of Human Servs.*, *supra*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Yarbrough v. Arkansas Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006). This, however, does not mean that the appellate court is to act as a "super factfinder," substituting its own judgment or second guessing the credibility determinations of the court; we only reverse in those cases where a definite mistake has occurred.

The law presumes that a fit parent acts in the best interests of his or her children. *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). While there is still reason to believe there can be a positive, nurturing parent–child relationship, the law favors preservation, not severance, of natural familial bonds. *Santosky v. Kramer, supra.* When DHS and the courts become involved in a child's life, the purpose is not to sever the familial bonds but to assure that the child receives the guidance, care, and control necessary to serve his or her physical, emotional, and mental welfare. Ark. Code Ann. § 9-27-302(2) (Repl. 2002). Once a child has been adjudicated dependent-neglected, there is a presumption that DHS will provide services to preserve and strengthen the family unit. *See* Ark. Code Ann. § 9-27-327(a)(2) (Supp. 2005) (noting that a party recommending no reunification services has the burden of proving that such services should not be provided).

Termination of parental rights should only be the goal when "the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2005). "Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members." *Santosky*, 455 U.S. at 788 (Rhenquist, J., dissenting). Once the decision is made to terminate a parent's rights, many resources that originally went to preserving the family unit go to making the separation of parent and child permanent. *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18 (1981) (Blackmun, J., concurring). For these reasons, termination proceedings are not meant to be taken lightly.

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

*Santosky*, 455 U.S. at 753.

*Background Facts*

On March 25, 2004, the Fayetteville Police Department called the Arkansas Child Abuse Hotline and reported that appellant had called 911 but had hung up. The officers sent to appellant's home reported feces on the bathroom floor, urine on the kitchen floor, clothes piled throughout the house, and no food in the house. There were no burners on the stove to prepare food, and gas was leaking into the home. G.B. had several scars on his chest. The next day, Investigator Amber Collins of the Arkansas State Police and DHS Investigator Monika Isenhower visited the home, where they found appellant crying and unresponsive to questions. Appellant's home was untidy, with clothing piled on the furniture and beds. The one usable bed had no sheets or pillows. Dirty dishes were on the counter and in the sink. Appellant stated in an exasperated tone that she did not know how the house got so dirty and demanded to know how it happened. She also had trouble keeping track of the children in the home. Specifically, she was unaware of G.B.'s whereabouts until friends of appellant showed up with him after a trip to the park. DHS took custody of appellant's three children.

On March 30, 2004, appellant voluntarily admitted herself to Washington Regional Medical Center; she was later placed in inpatient treatment at Vista Health, with a preliminary diagnosis of postpartum psychotic depression. The circuit court found probable cause for DHS to exercise custody of the children on March 31, 2004, and the parties stipulated to an adjudication that the children were dependent-neglected on April 23, 2004. In the subsequent adjudication order, appellant was ordered to take her prescribed medications, follow all discharge recommendations of Vista Health, participate in counseling, obtain a drug screen, and follow the DHS case plan.

The record of the review hearing on August 18, 2004, shows that appellant moved into a new, three-bedroom home and that DHS family service worker Trisha Burks had no concerns about the appropriateness of the home. Appellant regularly attended visitations, only missing a couple after she started working a late shift. She had been taking all of her prescribed medications and attending weekly counseling sessions at Ozark Guidance Center (OGC). Appellant also attended parenting classes on her own, but DHS was concerned that the classes were not age appropriate. Burks testified about the favorable impression she received concerning an incident that occurred while she was doing a home

visit. During that visit, a neighbor came over and demanded that appellant let her use her van to pick up her husband from work. Appellant told the neighbor that she would be finished doing what she was doing and would then pick him up. The neighbor continued to push the issue, and appellant stood her ground. Burks testified that appellant showed assertiveness in that situation. Burks noted that appellant had done everything DHS had asked her to do and recommended a trial placement at home.

Christina Gupton, G.B. and T.B.'s foster mother, testified that the two children moved into her home on May 5, 2004. At that time, G.B. was withdrawn, distrusting, and spoke in two-word sentences. T.B. was very active and did not sleep through the night. Since that time, G.B. began speaking in full sentences, making eye contact, and initiating conversation. T.B. had calmed down and started sleeping through the night. The court also heard testimony from CASA volunteer Dick Fulton, who had visited Gupton's home and recommended that the children not be returned to appellant. He wanted more information about appellant's abilities to cope with the children.

The circuit court did not place the children back into the home, stating that it was not in their best interests. The court noted that the children had made great strides while out of the mother's care. It recognized that the two older children had special needs and opined that it was inappropriate to place the children in the home to determine whether appellant could care for the children. The court ordered appellant to attend twelve hours of age-appropriate parenting classes, transfer her SSI benefits to the children for support of the children, and follow the other orders of the court.

By the November 4, 2004, review hearing, some of the visitations were taking place at DHS offices, while others were at McDonald's. Burks testified that there was some concern during a visit at McDonald's when appellant was letting an aide take care of the children; however, the visits were going well. Appellant had been in compliance with court orders, including completing parenting classes and maintaining a stable household. Burks recommended that John Benedict, appellant's father, be allowed to supervise visitation. She also had no objection to the children visiting appellant at appellant's home as long as appellant's father was there to supervise.

John Benedict testified that he had observed two of the McDonald's visits and that appellant interacted with her children.

He stated that he was willing to supervise the visits. He testified that he visited appellant's home a couple of days before the hearing and that the home was clean and physically safe.

Appellant testified that she had taken her medications, followed Vista Health's discharge recommendations, participated in counseling, taken a drug screen, followed the case plan, took twelve hours of parenting classes, received a psychiatric evaluation and followed the recommendations, and called SSI to get the benefits transferred to the children. She opined that her decision-making abilities had improved.

Fulton testified that he visited appellant's home on October 10, 2004, and that her home was a mess, with many things stacked up. He noted that there was some evidence of dishes being washed but that there was a lot of dirt. He opined that the condition of the home posed a threat to a small child. However, Fulton thought it could be appropriate if appellant's father supervised the visits at home.

The court ordered that the children remain in DHS custody. It acknowledged that appellant was compliant with the court's orders; however, it did not believe that appellant reached a point where she could meet the basic needs of her three children. It also ordered an additional nine hours of parenting classes. In the subsequent order, the court allowed appellant's father to supervise visitations on Sunday afternoons and authorized additional visitation after school on Thursdays if those visits went well.

A permanency planning hearing was held on January 28, 2005. Fulton stated that he visited appellant's home the previous day and testified that appellant had made tremendous progress since his last visit. While he was concerned that there were a lot of things stacked in closets, he opined that appellant's home, if maintained, was appropriate for children. He was unsure if appellant could maintain the progress.

Appellant testified that she had attended nine additional hours of parenting classes and had continued counseling. She believed that she could handle her children. On cross-examination, appellant admitted that she had not kept her house clean but that she had been trying to keep it up. She stated that the unsupervised visits had been going well.

Dale Gupton, G.B. and T.B.'s foster father, testified that when he first met G.B., G.B. was a loner, but that G.B. grew out of it. G.B. had been struggling with reading at school, but his

teachers had given positive comments about him. T.B. had not been exhibiting any unusual behaviors. He was receiving occupational and developmental therapy at the Richardson Center. Gupton stated that the visits with appellant had gone well, and he had not had any concerns about the children's behavior when they returned from the visits. Otis Robinson, D.B.'s foster father, testified that D.B. was adjusting to his home and bonding with his foster family. He stated that D.B. does not go to appellant willingly when he is taken to visits and that D.B. is happy to see him when he is picked up from visits.

The court also considered a letter from Joshua Newman, a therapist at OGC, dated January 27, 2005:

> In considering the progress of Lyla Benedict during the past seven months of counseling, there are several factors that I am looking at. Objectively, Ms. Benedict has kept her appointments with punctuality and has consistently verbalized an earnest love for her children. On several occasions she has reported the ways in which she is fulfilling the court's requirements and is following the instructions from the Department of Human Services.
>
> Many of the therapeutic goals developed on the day of her treatment plan have been met. Her acute symptoms are stabilized and she has increased her functioning level. Intellectual functioning appears to be stable, with some cognitive deficits. She has made mixed progress with some of her short-term goals, as evidenced by a limited ability to tie insights from different sessions together. She has shown willingness to process emotional and relational stressors in session, and has vocalized an interest in continuing counseling on a voluntary basis after her court requirements are over.
>
> Subjectively, I have felt a difficulty communicating with Lyla at times and have wondered how well she makes connections between past events and present choices. We have explored relationship issues and she appears to have some defensiveness about her son's fathers, while also recognizing some of the risky behavior that they have engaged in. Overall, she has become more open and more stable in mood, while making mixed progress on an interpersonal level.

At the end of the hearing, the court changed the goal of the case from reunification to adoption of the children and termination of appellant's parental rights. The court found that appellant

still lacked the ability to maintain a safe home and properly supervise her children. While the court acknowledged that appellant had made progress in obtaining short-term goals, it believed that appellant would be unable to achieve the long-term goals.

DHS and the attorney ad litem filed a joint petition for termination of appellant's parental rights on February 8, 2005, and the termination hearing was held on April 27, 2005. DHS moved to dismiss the termination petition; however, the ad litem wished to continue with the termination proceeding. The court denied the motion, but it noted that DHS recommended reunification as the goal at the permanency planning hearing and that it was not recommending termination of appellant's parental rights at that time.

Fulton testified that he continued to monitor visitation between appellant and the children since the permanency planning hearing. He noted that appellant's home had vacillated between being clean and having a lot of "stuff" everywhere. He did not observe any serious problems with the children, but he noted that G.C. tended to act out more when appellant was present. Fulton opined that G.C. simply wanted attention. He stated that he was recommending that appellant's parental rights be terminated, although that was not his recommendation at the permanency planning hearing. He stated that, with appellant only having the children eight hours during the week, he had not seen enough evidence during those periods to justify returning them to her. On cross-examination, Fulton stated that he did not think that G.C. wanting more attention from appellant was a serious problem. He also stated his concern about appellant having custody of the children for a trial period, opining that appellant would need a lot of support in her home to do it. Fulton stated in his recommendations that appellant had not demonstrated the emotional or physical stamina to be a single parent to three boys and that the children play as if they are with "Aunt Lyla" rather than with their mother.

Brian Manire, counselor at Jefferson Elementary, noted that G.B. attended Jefferson from August 18, 2003, until March 29, 2004. He referenced a letter he wrote dated April 22, 2004, wherein he recommended that G.B. repeat kindergarten. He noted that G.B.'s academic skills were slow to develop and that G.B. had experienced difficulty in the area of social development and work skills. Manire stated that, from the first week of kindergarten, G.B. was unable to attend to tasks and sit still. G.B. would

spit, flip off teachers and other children, and hit people. He called one of the adult aides "the b-word." Manire recounted several instances where G.B. would stick his hands down other student's pants and other instances where he would lick other student's ears. Manire stated that appellant always responded to any requests to come talk to school officials; however, he had concerns about appellant's ability to meet G.B.'s behavioral and academic needs.

Joshua Newman testified that he had been providing appellant with counseling for the previous two months. When he first started counseling her, appellant was going through an adjustment disorder, which Newman described as symptoms of an unstable mood and some disorientation. He also noted high levels of stress. Newman testified that appellant saw possible problems in interpersonal relationships. He noted that appellant would sometimes not answer the questions he asked and that she would have difficulty staying on track with the topic. Newman recalled the letter that he wrote to the court in January 2005. Regarding his statement about appellant's mixed progress with short-term goals, Newman stated that appellant was growing in her sense of stability; however, there were some areas in boundaries and relationships where he did not see appellant gain awareness of some of the problems she was having. He opined that her severe symptoms in March 2004 were triggered by a combination of things, including a physical illness that occurred surrounding birth complications and the stress of D.B.'s birth. Newman estimated appellant's GAF score to be 68.[3] Her initial score was 55. Newman believed that appellant had the necessary skills and abilities to function as an independent adult, but he did not know if she had the skills and abilities to be an effective parent.

On cross-examination, Newman noted that he did not continue with Vista Health's diagnosis of postpartum depression. He also no longer felt that appellant met the criteria for an adjustment disorder. Newman opined that appellant's ability to handle herself socially depended upon the situation, but that her behavior for the most part was stable and improving. He stated that

---

[3] Newman explained that the GAF, or global axis of functioning, is a scale from the DSM-IV. The scale ranges from 0 to 100, with 100 being excellent and a level at which few people function. As one goes down the scale, one will have a decreased ability to function on a daily level. Newman stated that a person in need of residential treatment would have a GAF of about 50.

appellant was at borderline intellectual functioning and that her level of functioning was the same as it was when he first met her.

Richard Back, a clinical psychologist, testified that he met appellant on three different occasions: once for an evaluation of her social security and twice for the present litigation. The first time he saw her, he performed a WAIS intelligence test, which yielded a verbal IQ of 71, a performance IQ of 84, and a full scale IQ of 75.[4] Back saw the results of an IQ test administered earlier that month at OGC, and the results were essentially the same as the one he administered two years prior. Back noted that his review of clinical literature indicated that a surprising number of borderline intelligent people who receive proper parenting training and counseling are capable of improving and providing appropriate parenting to their children. In other words, for people like appellant, Back stated that one should "give her training and then see what happens." He stated that it was "time to find out if she can do it or not — if she can be an appropriate parent."

Back stated that psychosis means "losing contact with reality and doing all sorts of bizarre and odd things." He said that it is important to look at why that person is psychotic, and that psychosis results for one of three reasons: schizophrenia, bipolar disorders, and major depression. Back opined that appellant's psychosis came from major depression. He stated that when he saw appellant, he saw no evidence of psychotic symptoms and no evidence of depression. He stated that it had been a year since appellant had an acute episode and that appellant had recovered from it. Back acknowledged that removing the children from foster care would be a disruption in their lives, but that the disruption would pay off if the natural parent can do the job. On cross-examination, Back acknowledged that he had never seen appellant with the children and that he could not form an opinion on her parenting without actually seeing her with the children. However, he reiterated his recommendation that the children be placed in the home for a trial period.

Nancy Webb testified that she began treating G.B. on September 17, 2004. She noted that G.B. was under control but a

---

[4] Back explained that the verbal IQ tests a person's ability to utilize language, define words, understand spoken sentences, do arithmetic problems in his or her head, and understand the connection between similar words; whereas, the performance IQ has more to do with coordination.

little hyper and anxious when she first saw him. During the diagnostic interview, she learned that G.B. had been oppositional, aggressive, and depressed. While in counseling, they worked on some of the anxieties and stress reduction. Webb opined that, if appellant's parental rights were terminated, G.B. would be adoptable. However, she stated that she could not make a recommendation as to what is in G.B.'s best interest because she did not know appellant. Regardless of the result, however, Webb recommended that he needed to stay with mental health care, as he could easily slip back into oppositional, aggressive behavior.

Diane Krutcher, a case manager at the Richardson Center, testified that T.B. first entered the Richardson Center in August 2004. She stated that according to a developmental evaluation from the summer of 2004, T.B. had developmental delays and would require rehabilitation. She stated that she had seen problems in T.B.'s speech, problem-solving skills, and fine-motor skills. T.B. was also calmer and was able to ask for what he needed.[5] Krutcher noted that the change could have also been attributable to age; however, she attributed the changes to having a stable environment.

Christina Gupton stated that, after the permanency planning hearing, G.B. had some sleeplessness and regression issues; however, those problems worked themselves out. Gupton stated that some of the behaviors manifested after visits with appellant, although they usually did not happen immediately after the visit. She believed that G.B. anticipated visits with appellant and that his emotional condition was good. T.B.'s behavior had not changed since the previous meeting. Gupton stated that appellant is consistently at McDonald's to pick up the children for the visits, although recently she had been ten to fifteen minutes late. Occasionally, there would be behavior problems with G.B. during the visits, and one time, he wanted to come "home."[6]

Otis Robinson testified that, since the permanency planning hearing, D.B. had learned to walk. He noted that D.B. receives physical therapy, and there had been talk about speech therapy down the road. Robinson also noted that D.B. sings a lot, although no one knows what he is singing. Robinson noted that he had been

---

[5] For example, rather than hitting someone and saying, "Read me this book," he would come up to a person and say, "Would you please read me this book?"

[6] We do not know whether "home" referred to the foster home or elsewhere.

in appellant's house and that the house is cluttered. He noted that D.B. would often be dirty when he picked D.B. up from the visits. He opined that the home would not be good for D.B. because D.B. could get lost under something while playing with his brothers. Robinson was also concerned because there were people at appellant's house that he did not know. He noted that D.B. had warmed up to appellant; however, he was still shy about the visits. D.B. had become more familiar with appellant, but he still looks forward to going back with Robinson when Robinson picks him up. On cross-examination, Robinson stated that he and his wife would try to adopt D.B. if appellant's parental rights were terminated.

Patricia Burks testified that she visited appellant's home once after the permanency planning hearing. When she saw the home, the condition was appropriate. There were no health or safety concerns, and while the house was cluttered, it looked better than it did originally. She testified that she had never seen the home when it was inappropriate or with any health or safety hazards. She noted that appellant was working two part-time jobs: one at Dollar General, where she worked twelve hours a week; and the other at the Arkansas Democrat-Gazette, where she worked one night a week for three hours. Burks recommended that the children be returned to appellant on a permanent basis and that, if that occurred, appellant's father would babysit whenever appellant had to work nights and that appellant would quit the night job if necessary. On cross-examination, Burks testified that on the occasion where she visited appellant's home, the children were well behaved.

Mark Owen, store manager at Dollar General, stated that he had no concerns about appellant's intellectual functioning ability. He stated that appellant is always punctual for work and always does her tasks. He stated that he had also met appellant's children and that appellant's interaction with them is appropriate. He noted one instance where one of the children was about to go to another aisle on their own, to which appellant demonstrated control of that child while holding one of the other children.

John Benedict testified that he had observed all of the supervised visits from the previous November to the termination hearing. He believed that appellant was appropriate with the children. Benedict recalled the FINS petition filed in 2001. He noted that he filed the petition because he was concerned about

appellant's safety and the effect of others being around G.C., who was the only child at that time. He stated that the petition was filed for appellant's safety and not because of her mental condition. Benedict noted that he owns appellant's home and that he thought it was appropriate for raising three children. He also stated that he had made provisions for providing housekeeping and day care services for appellant if she received custody of the children. On cross-examination, Benedict testified that, when he filed the FINS petition, he was concerned that appellant would lose her housing. He was also concerned about appellant being influenced by others and appellant not providing regular meals to G.C. Benedict stated that he has continued to be concerned but that he has tried to provide enough support for her and believed that appellant could care for the children long-term.

Appellant testified that she had been going to counseling and following her counselor's recommendations. She noted that she was taking Klonopin and Piroxican, an anti-inflammatory for her asthma, and stated that her medication helps with her stability and ability to cope. She stated that she had maintained a safe and clean home, although she does get behind on the laundry. She was willing to accept her father's offer to have someone help her with the house. Appellant testified that she was ready to take her children home and that, if she needed help, she knew where to get it.

On May 25, 2005, the circuit court entered an order terminating appellant's parental rights to her three children. It found that, despite reasonable efforts by DHS, appellant had not rehabilitated the conditions that caused the children to come into DHS care and that appellant had manifested an incapacity to meet the needs of the children. After noting the circumstances under which the children came into DHS care and recounting the testimony at the termination hearing, the circuit court concluded that appellant had not shown that she could put into daily practice what she learned from her parenting classes and from her counseling; that she could not make proper choices in dealing with interpersonal relationships, social skills, and parenting skills to keep the children safe; and that she continued to struggle financially. The court also found all three children to be highly adoptable.

### Discussion

Unfortunately, appellant's brief is unclear as to her specific arguments. Nowhere in her brief does appellant discuss the specific

grounds under subsection (b)(3)(B) that must be proven in order to terminate an appellant's parental rights. She cites subsection (b)(3)(B)(i), but does not explain how the circuit court erred in finding that despite a meaningful effort by DHS to rehabilitate the home and correct the conditions which caused removal, those conditions had not been remedied. She completely fails to address the circuit court's ruling that appellant was incapable of remedying the conditions that caused removal of the children from her home. Further, in her main brief, appellant only states regarding the statutory bases for termination: "The ad-litem failed to prove by a clear and convincing standard that all three of the children were adoptable and the potential harm of the health and safety of the three children by continuing contact with their mother." No specific argument is made in her main brief regarding the factors outlined in subsection (b)(3)(B); therefore, we consider any argument pertaining to those factors abandoned on appeal.[7] *See Marshall v. Madison County*, 81 Ark. App. 57, 98 S.W.3d 452 (2003). Even if appellant's citation to subsection (b)(3)(B)(i) constituted discussion of the subject sufficient for this court to rule upon it, appellant failed to address the court's finding that she was incapable of remedying the conditions that caused removal. Appellant's failure to address that ruling makes it unnecessary to consider the grounds under (b)(3)(B). *See Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001) (holding that error in the circuit court's finding that termination was warranted by the mother's failure to support the children was harmless in light of the record supporting the finding that she failed to remedy the conditions that caused the children to be removed from the home). Therefore, the only preserved argument regarding the circuit court's decision to

---

[7] In her reply brief, appellant states:

> The plain language of the statute provides that the court must find by clear and convincing evidence that termination is in the child's best interest, and that despite meaningful efforts by DHS to rehabilitate the home and correct the conditions which caused removal, the conditions have not been remedied. In this case, neither the mother was proven unfit or was it proven that it in [sic] was in the children's best interests to terminate the parental rights. In fact overwhelmingly the evidence showed the mother had remedied the conditions which caused removal.

Appellant's Reply Brief at Arg. 2-3. This is the first place on appeal that appellant has argued that she had remedied the conditions which caused removal. This court does not address arguments made for the first time in a reply brief. *Ayala v. State*, 365 Ark. 192, 226 S.W.3d 766 (2006); *Maddox v. City of Ft. Smith*, 346 Ark. 209, 56 S.W.3d 375 (2001).

terminate appellant's parental rights is whether that decision was in the best interests of the children.[8]

Nevertheless, we reverse the order terminating appellant's parental rights. An overwhelming majority of the termination cases that come before this court involve parents who could not sustain efforts to remedy those problems that caused DHS to be involved in their cases or parents who manifest extreme indifference to the health, safety, and welfare of their children until the termination of their rights becomes imminent. Appellant does not fit either category. The evidence shows that she was having a psychotic episode when DHS took the children into their custody. Yet, the record shows that since that time, appellant has made consistent efforts to improve her parenting skills and get to a point where she can raise her children despite her mental deficiencies.

The Arkansas Code instructs that when considering the best interests of the children, the circuit court shall consider the likelihood that the children will be adopted and the potential harm that may arise from returning the children into the parent's custody. *See* Ark. Code Ann. § 9-27-341(b)(3)(A). The circuit court heard testimony that two of the three children were adoptable.[9] However, both DHS and Back recommended that the court place the children in appellant's home before making conclusions about appellant's parenting ability. Fulton was the only person at the termination hearing who explicitly recommended that appellant's rights be terminated; however, he based his opinion on simply not seeing enough evidence to justify returning the children to appellant's custody. Meanwhile, appellant's mental health-care providers testified that appellant was overcoming her mental deficiencies to the point where she deserved a chance to be a parent to her children. Back opined that appellant needed to at least be given a chance to demonstrate her parenting abilities

---

[8] We can reverse the termination of appellant's parental rights without addressing the grounds under subsection (b)(3)(B). In *Conn v. Arkansas Department of Human Services*, 79 Ark. App. 195, 85 S.W.3d 558 (2002), the circuit court terminated the appellants' parental rights solely based on the ground that their parental rights had been terminated to other children, a ground for termination under subsection (b)(3)(B)(ix)(*a*)(*4*). This court reversed because the circuit court failed to consider the child's best interest, as required by subsection (b)(3)(A).

[9] Webb testified that G.B. was adoptable, and Robinson testified that, if appellant's parental rights were terminated, he and his wife would like to adopt D.B. No testimony was heard regarding whether T.B. was adoptable.

before the circuit court reached a decision regarding her parental rights. Finally, appellant made sincere efforts to comply with every order of the court. The only evidence of appellant's failure to comply with the court's orders was the evidence that appellant would sometimes neglect her housekeeping duties. However, there was no evidence that the condition of her home reached the dangerous level that warranted DHS intervention in March 2004.

The ad litem relies on several cases to support her argument that the circuit court's ruling should be affirmed; however, none of them are persuasive. First, she cites *Crawford v. Arkansas Department of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997), and *Malone v. Arkansas Department of Human Services*, 71 Ark. App. 441, 30 S.W.3d 758 (2000), for the proposition that a court can properly consider improvement in the children while in foster care in its decision to terminate parental rights. Indeed, appellant's children showed improvement while in foster care. However, in both *Crawford* and *Malone*, the parents were incarcerated for significant periods of time and did little to comply with the orders of the court. That is not the case here. In addition, the circuit court never had an opportunity to see if appellant could maintain the progress made while the children were in foster care once they were returned to her care. If the ad litem's reliance on these cases is followed, then a parent's rights could be terminated simply because others can take better care of the children.

Next, the ad litem notes our decision in *S. v. Arkansas Department of Human Services*, 61 Ark. App. 235, 966 S.W.2d 919 (1998). Like appellant here, the mother in *S.* had an IQ in the mid-70s, and DHS was involved in the case due to environmental neglect. However, the parent in *S.* was resistant to the attempts to instruct her on meeting her children's needs. Appellant has been nothing but willing to learn.

The ad litem cites *Cassidy v. Arkansas Department of Human Services*, 76 Ark. App. 190, 61 S.W.3d 880 (2001), where the lower court found the parent to be unwilling and unable to care for her children. The court in that case also heard testimony that the parent's efforts to complete the case plan were insincere. Here, the evidence did not show that appellant was unable and unwilling; it only showed that she would need help in caring for the children — help that many others, including DHS, were willing to provide. Further, there is no evidence that appellant's efforts to comply with the case plan were insincere.

Finally, the ad litem cites *J.T. v. Arkansas Department of Human Services*, 329 Ark. 243, 947 S.W.2d 761 (1997). There, the child testified that she did not feel comfortable around the mother, who was bipolar and had a drinking problem. The mother candidly admitted at the termination hearing that she was not ready to care for her child. Finally, the therapist could only recommend gradual integration of the child into the parent's home. The present case is clearly distinguishable. The children were comfortable with appellant, and appellant testified that she was ready to take the children into her home and that if she needed help, she knew where to go. Further, while the lower court in *J.T.* was unwilling to allow for the gradual integration of the child into the parent's home, there had been two years between DHS filing the petition for emergency custody and the order terminating the parent's rights. Here, the length of time was only fourteen months. While fourteen months is more than the requisite time before a termination order can be entered, we do not interpret our statutes to mandate termination of parental rights as soon as the children have been out of their parent's custody for over twelve months.[10]

█ Clearly, the record shows that appellant was initially incapable of caring for her children and that her children were at risk. Throughout DHS's involvement, appellant showed marked progress in her ability to provide a stable home. We hold that on this record, where appellant has by all accounts cooperated with the orders of the court, benefitted from the services provided by DHS, and shown objective improvement to the benefit of the children, the circuit court clearly erred in terminating appellant's parental rights. Therefore, we reverse the order terminating appellant's parental rights and order the circuit court to continue reunification services.[11]

We conclude with a comment about the performance of the attorneys in this case. As previously stated, the brief filed on

---

[10] The circuit court seemed to also rely on the prior FINS petition filed in the case; however, we note that G.B. was never removed from the home (contrary to the circuit court's assertions) and the FINS case was eventually closed.

[11] While we do not address appellant's hearsay arguments, we note that we only review errors that occur at the termination proceeding. *See Lewis v. Arkansas Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005) (explaining in the context of a no-merit appeal that this court is precluded from reviewing adverse rulings from the adjudication, review, or permanency-planning hearings).

appellant's behalf has not been helpful. Much of the argument reads more like a legal commentary on the proceedings rather than an argument supporting reversal.

We are even more disappointed with the attorneys for DHS and for the children. "A termination of parental rights is both total and irrevocable. . . . [I]t leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." *Lassiter*, 452 U.S. at 39 (Blackmun, J., dissenting) (footnote citation omitted); *see also* Ark. Code Ann. § 9-27-341(c)(1). Despite the seriousness of a termination proceeding, DHS's attorney and the attorney ad litem treated the proceedings casually. Both DHS and the ad litem filed a termination petition, then counsel for DHS stood on the sideline while the ad litem carried the ball, despite the fact that DHS maintained the position that termination of appellant's rights was not warranted in this case. Once termination proceedings were complete and appellant filed her appeal, counsel for DHS continued to distance themselves from the proceeding by opting not to file a brief in this case. This raises the impression that counsel for DHS did not view her role as advocate with the gravity that a termination of parental rights would seem to indicate.

Reversed and remanded.

VAUGHT and ROAF, JJ., agree.