Cite as 2025 Ark. App. 565

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-25-382

| | |
|---|---|
| STEPHANIE BYRAMS<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered November 19, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION<br><br>[NO. 60JV-23-688]<br><br>HONORABLE TJUANA BYRD MANNING, JUDGE<br><br>AFFIRMED |

**WENDY SCHOLTENS WOOD, Judge**

Stephanie Byrams appeals the Pulaski County Circuit Court's order terminating her parental rights to Minor Child (MC) (DOB 10/16/20). She contends that the circuit court clearly erred in finding that termination was in MC's best interest. We affirm.

## I. *Facts*

On July 24, 2023, the Arkansas Department of Human Services (DHS) received a hotline report that police officers had responded to a call reporting that Byrams was standing on her apartment balcony waving a knife around with MC in her arms. Byrams told the responding officers that she was afraid and heard people talking through the wall. There was no indication that Byrams made threats toward MC, and she was not charged with any offense, although officers did confiscate her knife.

On July 27, a DHS family-service worker, Fiero Stewart, spoke with Byrams's case manager at the Veterans Administration (VA), Ashley Gilcrest, who had been working with Byrams since 2020. Gilcrest told Stewart that Byrams had a history of drug use, that Byrams was paranoid and having delusions when Gilcrest checked on her on July 25, that her mental-health issues had recently gotten worse, that Gilcrest had made a visit to Byrams's home on July 27, and that Gilcrest had decided to have Byrams transferred to the VA Hospital by ambulance due to the severity of her condition. That same day, Stewart met Gilcrest at Byrams's home. Byrams submitted to a drug screen—which was positive for methamphetamine, amphetamines, and THC—and was transported to the VA Hospital. Byrams's sister, who agreed to keep MC while Byrams was in the hospital, told Stewart that Byrams had a history of drug use and had eight other children who were in the care of other family members.

At a DHS team decision meeting held on August 3, Byrams admitted that she had used drugs that morning in the front room of her home while MC was in the back bedroom. Byrams submitted to another drug test and again tested positive for methamphetamine, amphetamines, and THC. DHS removed MC from her custody.

On August 7, DHS filed a petition for emergency custody alleging that MC was dependent-neglected as a result of neglect and parental unfitness. The circuit court granted the petition and entered a probable-cause order on September 18. MC was adjudicated dependent-neglected after a hearing on September 19 due to parental unfitness and neglect on the basis of Byrams's mental-health instability and illegal drug use. The court also found

aggravated circumstances in that there was little likelihood that services would result in successful reunification in a time frame consistent with MC's needs. The court set a goal of guardianship with a fit and willing relative or adoption with a concurrent goal of reunification. The court noted that neither Byrams's sister nor MC's grandmother could handle MC and that MC had been placed in a specialized foster home. Byrams was awarded four hours a week of supervised visitation.

After a review hearing held on December 19, the court found that Byrams was in the VA dual-diagnosis program receiving treatment for mental-health and substance-abuse issues and that she had participated in family time. The court ordered Byrams to complete the case-plan services through the VA or other appropriate providers; demonstrate mental stability and sobriety; and provide evidence that she had a safe and stable home, income, and employment. DHS was ordered to make a referral for a psychological evaluation for Byrams along with all other referrals necessary. The goal of the case remained guardianship or adoption with a fit and willing relative with a concurrent goal of reunification or custody with a fit parent. However, the court also authorized DHS and the attorney ad litem to file a termination-of-parental-rights petition.

A second review hearing was held on March 28, 2024. The court found in its order that MC had been tested and determined to be on the autism spectrum; was receiving therapeutic foster-care services, speech therapy, occupational therapy, and additional therapy; and was doing well in her therapeutic foster home. The court noted that MC had difficulty after family visits, including trouble winding down and nightmares. The court

found that Byrams was minimally compliant with the case plan, had participated in family time but was not consistent and had missed four or five visits, had lived in three different places since the last review hearing, and admitted that she would test positive for drugs if tested on the day of the review hearing. Byrams completed her psychiatric evaluation and drug-and-alcohol assessments, and both recommended a "dual diagnosis" of substance abuse and mental-health issues. The court ordered her to assist her attorney in getting records from the VA regarding her treatment there; participate in therapy with a DHS service provider; make efforts to be more consistent with visits; work toward sobriety and being drug-free; and submit to screens when requested.

After a July 25 permanency-planning hearing, the court authorized a plan to place custody of MC with Byrams, finding that she had made significant, measurable progress toward the case-plan goals. The court found that she was taking her medication regularly and had submitted to drug screens at the VA, which had been negative, noting that she had been in the program at the VA since April and had not used drugs since that time. She had been diagnosed with PTSD and psychosis. The court wanted to see Byrams demonstrate a longer period of stability to be sure that MC could be returned to her safely, and it gave Byrams three more months to continue her mental-health services, maintain her sobriety, obtain a stable home for herself and MC, and demonstrate that she can provide full-time care of MC.

The circuit court held a fifteen-month review hearing on November 19. Dr. Bell Tolliver, who has provided therapy to Byrams since August 2024, testified that Byrams could care for MC as long as Byrams remained connected with the VA but that without VA

4

involvement, things would deteriorate, and MC would be put at risk. Chad Strike, a therapist with Second Chance Ranch who has treated MC since February 2024, said that MC has autism-spectrum disorder and separation anxiety. He said that MC had made huge progress but needed predictability and structure in her life.

The court recognized that in the three months the court had given Byrams to obtain housing and demonstrate that she could provide a safe placement for MC, Byrams had discontinued her therapy at the VA for PTSD and planned to start again in January; had gotten an apartment; and was unquestionably doing better than she was when the case was opened. The court then made the following findings in the review order:

> 5. . . . [T]he court is not at a point today where [MC] could be safely returned to her mother's custody. This case is now more about whether [Byrams] can provide for the care of this non-verbal, autistic, but progressing child and meet her special needs. The two conditions repeated over and over today that might ensure a safe return are that [Byrams] and [MC] continue in all the services they are receiving and restarting therapy for [Byrams]. These are great big "ifs." They are essential for continued progress for both [Byrams] and [MC]. . . .
>
> Regression is not the goal here. The court will give the department the flexibility to work toward unsupervised visits in the home, but there must be a period of supervised visits in the home and some evidence of Ms. Byrams's ability to calm [MC] or "put the lid back on." If [Byrams] never has a bad day experience, the court is unable to assess her ability to provide full-time care for this child whose needs are great and very specific. . . .
>
> 6. The court, mindful of the available permanency planning dispositions, does hereby find that it is in the best interest of the juvenile that the goal of the case shall be adoption with the department or the attorney ad litem filing a petition for termination of parental rights.

On January 17, 2025, DHS and the attorney ad litem filed a joint petition to terminate Byrams's rights to MC on the grounds of twelve-months failure to remedy;

subsequent factors; and aggravated circumstances—little likelihood of reunification—which the court found in the adjudication order. DHS also alleged that termination was in the best interest of MC.

The court held a termination hearing on February 20. Strike testified that MC has ups and downs in her foster home but had recently begun engaging with the world around her. He testified that she had made progress but also had periods of significant regression. When he was asked about the effect on MC of her recent visits in Byrams's home, he said that it caused regression "across the board, O.T., P.T., Speech, her trauma responses." He said that when she returned from the visits, MC engaged in acts of aggression, struggled with her behavior, and had difficulty sleeping. He said that the visits stopped for three weeks over Christmas, and like the flip of a "light switch," MC was calm, cooperative, and suffered no tantrums. Strike observed only three of MC's visits with Byrams and admitted that he had not seen Byrams do anything concerning or that might have caused the regression. He said that MC had been fine when visiting Byrams on the same day and time at the DHS office, but she was not fine after visiting Byrams at her home. All he could say for "sure" was that something was triggering MC when visiting in Byrams's home. Strike said that MC's foster home has been her placement for thirteen months, and her brain is trying to figure out which home is her "home base." He said that MC is "a complex case" requiring a team of services and that the key to her success is structure and consistency.

Strike did not know MC's timeline for being "emotionally" able to return home with Byrams. He did believe that it was "possible" for Byrams to establish a routine for MC in six

to nine months. He said it had taken the foster parents thirteen months to get MC where she is and acknowledged that even the most "conducive placement" would cause regression for a child with MC's diagnoses. MC did not have a meltdown in any of the visits he observed, so he did not know if Byrams could manage one.

Byrams testified that, although she had a six-week break in therapy in November and December when her therapist was too busy seeing other patients, she was actively receiving therapy through the VA for PTSD and anxiety. She said she took medication as needed but currently had no medications that were mandatory. She admitted that she had been diagnosed with substance-induced psychosis when she was using drugs but said she no longer has those issues because she had not used drugs since April 2024. Byrams also testified that she has eight children in addition to MC and that all of them are being raised by other family members. She had consented to the termination of her parental rights to three of them.

Byrams believed that her visits with MC were going well, but she did not believe they had established sufficient stability due to issues with missed visits because of DHS. She recognized the importance of MC having structure, predictability, and routine and said that she had tried to instill that in her visits. She said that MC had gotten comfortable visiting in her home and acted like she did not want to leave when she was there. Byrams testified that she had not experienced one of MC's aggressive tantrums, but she had experienced issues when MC would get frustrated, and Byrams would hug MC to calm her down. Byrams believed she had not experienced aggressive tantrums with MC because MC was more

compliant with her. Byrams desired to be reunified with MC and did not believe she had been given a "fair shot" to demonstrate that she could "put the lid back on MC" if necessary.

The DHS caseworker, Danyetta Pride, testified that Byrams had completed the services and made "some progress" but did not think MC could be returned to Byrams's custody due to her lack of "mental health stability." Although Pride admitted that there had been no concern with drugs recently, she said that Byrams had used drugs in the past. Pride referred to Byrams's previous diagnoses, stating that these could cause Byrams to become aggressive or manic. Pride said DHS was concerned about whether MC might trigger Byrams's mental-health issues. Pride said that termination was in MC's best interest because MC is a four-year-old autistic child who requires stability, structure, and a caregiver who can be there "at the drop of a dime" because no one knows when MC is going to have an episode. She said that MC needs a parent who can comprehend, be attentive, and cooperate with those providing services. Basically, she believed that MC needs permanency, which Byrams had not demonstrated she could provide. Pride could not say whether Byrams had been given opportunities to learn about or assist MC with her specific needs, and she admitted that when the visits were moved to Byrams's home, MC's therapist could have been brought in to work with Byrams to learn about triggers and how to work with them, but that did not happen. DHS adoption specialist Kieanda McFadden testified there were no barriers to MC's adoption and that there were 353 potential matches.

The last witness to testify was Linda Young, a DHS program assistant. She testified that she had been driving MC to visitations with Byrams since June 2024 and had been to

forty-three visits with her, seventeen of those in Byrams's home. Young said that she had no concern for MC's safety in Byrams's presence. She said that MC did not like change and that it took MC a couple of months for her to get used to Young. Young testified that she had observed two tantrums and that Byrams demonstrated that she can adequately address them.

On April 3, 2025, the circuit court entered an order terminating Byrams's parental rights on the ground of aggravated circumstances—little likelihood of reunification, recognizing that it had previously made a finding of aggravated circumstances in the adjudication order.[1] Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)* (Supp. 2023). The court also found that termination was in MC's best interest. The court recounted the testimony, recognizing that there was no evidence that Byrams had demonstrated any recent concerning mental-health behaviors but noting that there had been a months-long lapse in Byrams's therapy, and she had introduced no evidence that she had been released from mandatory medication prescribed to her. Although the court sympathized with Byrams and recognized that she clearly loves MC, it found by clear and convincing evidence that it was in MC's best interest to terminate Byrams's parental rights:

> The Court finds that [MC] would be at risk of serious regression and additional negative impact to her mental health diagnoses if she were returned to [Byrams's] custody today due to the fact that this child has to have predictability, routine and structure, and, as stated, visits have not ever progressed to unsupervised in [Byrams's] home. [MC] would also be at risk without the immediate access to the services she is currently receiving, all of which work concurrently to provide appropriate stability and progress for her. Per the testimony of [Strike], [MC] is not at a regular four-year-old level, due to her challenges and will likely always be a little behind, but she needs

---

[1]The circuit court dismissed the grounds of failure to remedy and subsequent factors on the basis that the proof was not sufficient to support those grounds.

an environment where she will thrive and succeed with the wrap-around services to support her as she grows and progresses. Based upon the regression demonstrated in just the few weeks that [MC] had once the in-home visits began, the Court finds that it is not in the best interests of this autistic child with limited verbal skills to be pushed to her limits of additional and more severe regression by returning custody to [Byrams]. The Court finds that termination of parental rights is in the child's best interests, and the termination of parental rights petition is granted.

Byrams's appeal followed.

## II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Cheney v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 209, at 6, 396 S.W.3d 272, 276. We will not reverse the circuit court's decision unless its findings are clearly erroneous. *Perry v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 323, at 10, 669 S.W.3d 865, 872. An order terminating parental rights must be based on a finding by clear and convincing evidence that one of the grounds stated in the termination statute is satisfied and that the sought-after termination is in the children's best interest. Ark. Code Ann. § 9-27-341. Credibility determinations are left to the finder of fact. *Kerr v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 271, at 6, 493 S.W.3d 342, 346.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Schaible v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 371.

10

Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.*, 444 S.W.3d at 371. Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*, 444 S.W.3d at 371.

### III. *Discussion*

Byrams's sole point on appeal is that the circuit court clearly erred in finding that termination is in MC's best interest.[2] Byrams argues that this case does not fit within the normal potential-harm analysis; specifically, she contends that the analysis refers to the potential harm to a child's health and safety that might come from continued contact with the parent. She argues that, here, the court did not terminate parental rights because Byrams's continued contact with MC presented a potential harm to MC's health and safety or because Byrams had failed to complete the case plan and was still not capable of caring for MC. She argues that, instead, the court's potential-harm finding concerned the difficulties MC experienced with changes to her environment due to her autism diagnosis. Byrams argues that the circuit court terminated her parental rights because it did not want to disrupt the routine MC had established while in foster care and the services that MC was receiving. Byrams understands these concerns but argues that the potential harm would exist whether the court places MC with Byrams or places MC in any other adoptive home. She

---

[2]Although she disputes that there was sufficient evidence at the time of the termination hearing to support the ground of aggravated circumstances, she recognizes that her failure to appeal the aggravated-circumstances finding made in the adjudication order precludes this argument. *Ussery v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 250, at 20, 646 S.W.3d 266, 278.

claims that the evidence presented at the hearing demonstrated that any change in MC's environment would cause regression and that it had taken thirteen months in the foster home for MC to achieve her current stability and structure.

In determining whether termination is in the best interest of a child, the circuit court must consider the entire history of the case and all relevant factors in the case, including the likelihood that the child will be adopted and the potential harm that would be caused by returning the child to the custody of the parent. *Jurls v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 443, at 16, 676 S.W.3d 316, 327. The potential-harm analysis is to be conducted in broad terms and is but one of the many factors that a court may consider in a best-interest analysis. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, at 12, 314 S.W.3d 722, 728. The polestar consideration is that termination must, after consideration of all relevant circumstances, be shown to be in the child's best interest. *Grant v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 636, at 13, 378 S.W.3d 227, 233.

We hold that the circuit court did not clearly err in finding that it is in MC's best interest to terminate Byrams's parental rights. The court considered the potential harm caused by returning MC to Byrams and found that it included ongoing concerns regarding Byrams's stability, particularly as it related to her mental health, as well as her inability to meet MC's special needs and help her deal with her anxiety and past traumas. The record shows that Byrams was initially incapable of caring for MC and that MC was at risk of serious harm. Byrams had a history of drug use; suffered from hallucinations at the initiation of the case; tested positive for methamphetamine, amphetamines, and THC; and was transported

to the VA Hospital for inpatient mental-health treatment. Byrams's sister, who kept MC for a week before DHS filed an emergency petition, told DHS that Byrams has a history of drug use and has eight other children who were in the care of other family members because of this history. During a meeting with DHS after she was released from the VA Hospital, Byrams admitted that she had used drugs that morning in the front room of her home while MC was in the back bedroom. Byrams submitted to a drug test at the meeting and again tested positive for methamphetamine, amphetamines, and THC.

Byrams testified at the termination hearing that she had been diagnosed with substance-abuse psychosis but contended she had not used drugs since April 2024 and thus did not have "those issues" anymore. Just three months before the termination hearing, at the fifteen-month review hearing, Byrams's therapist testified that she believed Byrams could care for MC as long as she remained connected with the VA but thought that without VA involvement, things would "deteriorate" and put MC at risk. At the hearing, Byrams testified that she had not attended therapy for several months and was no longer taking prescribed medication. Although Byrams provided reasons for both at the hearing, the credibility and weight of testimony is for the circuit court. *Gibby v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 145, at 8, 643 S.W.3d 479, 485.

Additionally, the record reveals that Byrams never achieved unsupervised visitation with MC. The three-week supervised visitation in Byrams's home caused MC to regress "across the board." Strike testified that MC is a "complex case" requiring a team of services, and he did not know the timeline for MC to be able to return to Byrams's custody. He

13

thought it was "possible" for Byrams to create a routine for MC within six to nine months, which further supports the finding in the circuit court's termination order that MC was subject to a "risk of serious regression and additional negative impact to her mental health diagnosis if she were returned to [Byrams's] custody today."

In support of her argument, Byrams cites *Benedict v. Arkansas Department of Human Services*, in which we reversed the termination of a mother's parental rights, holding there was insufficient evidence to support the court's finding of best interest. 96 Ark. App. 395, 242 S.W.3d 305 (2006). In *Benedict*, the children had been removed from their mother's custody the day after she voluntarily admitted herself for treatment for what was preliminarily diagnosed as postpartum psychotic depression. 96 Ark. App. at 399, 242 S.W.3d at 309. She stipulated to an adjudication that the children were dependent-neglected and was ordered to take her prescribed medications, follow all hospital-discharge recommendations, participate in counseling, obtain a drug screen, and follow the DHS case plan, which she did. *Id.* at 399, 242 S.W.3d at 309–10. Benedict's therapist testified at trial that Benedict's psychosis came from major depression, that he saw no evidence of depression at the hearing, that it had been a year since her acute episode, and that she had recovered from it. Although he acknowledged that removing the children from foster care would be a disruption in their lives, he opined that the disruption would pay off "if that natural parent could do the job." *Id.* at 405, 242 S.W.3d at 314. The court terminated her parental rights. We reversed the termination—stating that Benedict had cooperated with the orders of the court, benefited from the services provided by DHS, and shown objective improvement to the benefit of the

14

children—and ordered the circuit court to continue reunification services. *Id.* at 412, 242 S.W.3d at 319.

We do not find *Benedict* persuasive. Here, unlike the parent in *Benedict*, Byrams's psychosis was substance-induced. Byrams was admittedly using drugs when DHS took custody of MC and has a history of drug use, which appears to have resulted in the loss of all eight of her other children. While she had not used drugs for ten months at the time of the hearing, a parent's past behavior is often a good indicator of future behavior. *Miller v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 280, at 17, 626 S.W.3d 136, 145. Further, unlike the mother in *Benedict*, Byrams has a lengthy history with DHS that resulted in her not having custody of any of her other children. Finally, MC is a special-needs child who is autistic and nonverbal and will require "wrap-around services" to grow and progress. She must be in a stable environment that prioritizes predictability, routine, and structure. There was no evidence that the children in *Benedict* required such a specific environment. Each termination-of-parental-rights case is decided on a case-by-case basis. *Dominguez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 2, at 11, 592 S.W.3d 723, 729.

Byrams essentially asks us to reweigh the evidence and second-guess the circuit court's credibility determinations, which we will not do. The circuit court's best-interest finding is not clearly erroneous. Accordingly, we affirm the order terminating Byrams's parental rights.

Affirmed.

TUCKER and BROWN, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.