Tarequis FIELDS *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 08-296                                        289 S.W.3d 134

Court of Appeals of Arkansas
Opinion delivered November 5, 2008

*Deborah R. Sallings,* Arkansas Public Defender Commission, for appellant.

*Gray Allen Turner,* Office of Chief Counsel, for appellee.

*Jo Ellen Carson,* attorney ad litem for the minor child.

SARAH J. HEFFLEY, Judge. Appellant Tarequis Fields brings this appeal from the trial court's order terminating his parental rights to his son TF, born on March 23, 2006. He argues that there is insufficient evidence to support the trial court's decision. We disagree and affirm.

The Arkansas Department of Human Services (DHS) took TF and his half-brother into emergency custody on May 2, 2006, after the Fort Smith police arrested appellant and his girlfriend, Nikki Christian,[1] the mother of both children, at their home on drug charges. The affidavit[2] supporting the motion for emergency custody also noted that there were environmental issues with the home. The affidavit stated:

---

[1] Ms. Christian's parental rights to both of her children were also terminated at a separate hearing. We affirmed that decision on appeal. *Christian v. Arkansas Dep't of Human Servs.,* CA08-294 (Ark.App.June 25, 2008). We also note that TF's half-sibling is not involved in this appeal.

[2] At the termination hearing, the trial court incorporated and made a part of the record all the pleadings and orders contained in the case file. Although appellant objected to the court's action, appellant does not challenge the trial court's ruling in this appeal. Therefore, all pleadings and orders are before us and are properly considered as evidence in this case.

> Worker Williams observed that the home was dirty. Worker Williams observed that floors were dirty and covered with trash. Worker Williams observed that refrigerator was dirty, and the sink and counters were covered [with] dirty dishes and trash. Worker Williams observed that the family did not have running water. Worker Williams also observed that bathroom [was] dirty. There were clothes on the floor, and it appeared the family had been using the toilet for an extended time, since the water had been turned off. The toilet was full of feces to the point of almost overflowing.

> Worker Williams was able to speak with Detective Wayne Barnett. Detective Barnett states that law enforcement discovered one ounce of crack cocaine, drug residue, marijuana, a digital scale, and other drug paraphernalia in the home. Detective Barnett also states that officers located a forty-five automatic "Taurus" hand gun on [appellant].

The trial court granted DHS emergency custody of the children on May 5, 2006. The court later found probable cause to believe that the boys were dependent–neglected.

The adjudication hearing was held on June 16, 2006. Appellant was present at this hearing. The trial court found the children to be dependent–neglected and ordered appellant to complete parenting classes, have a psychological evaluation and drug and alcohol assessment, to obtain follow-up treatment as recommended, obtain and maintain stable housing and transportation, visit regularly, and to resolve the pending drug charges.

The case was reviewed on November 16, 2006. Appellant did not attend this hearing, nor was he represented by counsel. Genetic testing showed that appellant was the father of TF and a finding of paternity was made. The goal of the case remained reunification, although the court also found that appellant remained incarcerated and had been unable to comply with its orders.

At a permanency-planning hearing on May 1, 2007, the court changed the goal of the case to a concurrent one of reunification and termination of parental rights and adoption. The court again recognized that appellant had been unable to comply with court orders due to his continued incarceration. Subsequently, at a review hearing on August 7, 2007, the court set the goal as termination of parental rights and adoption. Appellant was not present at either of these hearings.

DHS filed a petition for the termination of appellant's parental rights on October 5, 2007. Counsel was appointed to represent appellant by an order dated December 7, 2007, and the termination hearing was held on December 21, 2007.

At the hearing, appellant testified that he had been incarcerated since his arrest on May 2, 2006, when TF was only five weeks old. In January 2007, he pled guilty to reduced charges of possession of marijuana with intent to deliver, possession of drug paraphernalia, and maintaining a drug premises, and he was serving concurrent sentences of ten years in prison followed by a suspended sentence of ten years. His driver's license had also been suspended. Appellant testified that his first possible parole date was in June 2008. He acknowledged that he had a disciplinary action in the past two months for fighting. Appellant testified that his eligibility for release was something that may happen in the future, if he did not get into any more trouble and "everything goes fine."

When paroled, appellant planned to live with his mother in Blytheville and get a job driving a fork lift or working in a factory, as he had done before. Appellant testified that since 2005, and during the time he lived with Ms. Christian in Fort Smith, he had only worked two days because he had left his car in Blytheville and lacked transportation to get to work. Appellant admitted that the home he lived in with TF was not very clean and that it had no running water. He also said that cocaine, marijuana, drug paraphernalia and scales were in the home. He also claimed ownership of the .45 pistol that was seized upon his arrest.

Appellant understood that TF had been out of the home and with the same foster family since TF was five weeks old. He believed that it was in TF's best interest to wait for him to get out of prison, set up a house, obtain employment, and get his driver's license restored. Appellant testified that no one from DHS had contacted him about a case plan, but that he was willing to take parenting classes and that he had completed anger-management and substance-abuse classes while he was in prison.

Angela Carvey, the DHS caseworker, testified that the department did not offer appellant any services but that services were provided for the child and foster parents. She recommended termination of appellant's parental rights because the foster home was the only home TF had known. She also stated that TF was adoptable and that the foster family had expressed the desire to adopt him. According to Carvey, the only part of the case plan that

appellant had completed was to resolve his criminal charges. On cross-examination, Carvey denied that the department had a policy of automatically seeking termination of parental rights any time a parent is incarcerated. She also said that she was unaware of any case where the department did not seek termination but instead waited for the parent to be released. She testified that the child had been in foster care for nineteen months and that it would not be in TF's best interest to wait any longer. Carvey further testified that the mother never suggested that appellant's family be considered as a placement for the child.

Nikki Christian, TF's mother, testified that, at the time the case arose, she and appellant were living together and that he was helping her with both children. She asserted that appellant was a good father. She admitted that she and appellant were both selling drugs. She said that she was still in communication with appellant and would resume her relationship with him when released from prison. On cross-examination, she admitted that their house was messy and had no running water and that the toilet was to the point of overflowing at the time the children were removed.

At the conclusion of the hearing, appellant's counsel argued that DHS had offered appellant no rehabilitation services whatsoever and thus DHS had failed to present sufficient proof of the ground for termination found at Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2008), which requires DHS to prove that it put forth a meaningful effort to rehabilitate the parent and correct the conditions that caused removal. Appellant urged the trial court to wait and see if appellant might be released from prison in June and then to see if appellant would carry through with the things he said that he was going to do if paroled. DHS responded that appellant knew what he needed to do to achieve reunification and that he had never contacted DHS in the nineteen months that had passed since the child was removed from the home. DHS also asked the court to consider the alternative ground for termination based on a parent's incarceration for a substantial period of the child's life found at Ark. Code Ann. § 9-27-341(b)(3)(B)(viii). The trial court announced its ruling terminating appellant's parental rights from the bench:

> The child has been out of the home for a period in excess of twelve months; it's actually been nineteen months. The court notes that the child was six [five] weeks old when removed from the home, and the child has virtually been out of the home its entire life. … The likelihood that the father could comply within a reasonable

time as viewed from the children's standpoint is highly unlikely. You know, by his own testimony he's not going to be eligible to get out, at the earliest, in what, June, another six months. And then if he got out and did absolutely everything perfect that he was supposed to do it would be another six months before the court would consider any type of trial placement. So, we're looking at another year, absolute minimum with a child that's now twenty [nineteen] months old and has spent all but six [five] weeks of its life in the State's custody. So, from the child's standpoint this cannot be accomplished within a reasonable period of time.

And, the only date that we're sure of, he entered a plea on January 17, 2007, and is serving ten years in the Department of Correction on possession with intent to deliver, possession of drug paraphernalia, and maintaining a premises for drug activities with credit for time served since May 2, 2006. You know, that is the date that we know for certain. These dates where they may be eligible all can fluctuate depending on their behavior. He's testified he's already had one disciplinary action, so you know, that is just something that may happen.

Then the other thing the court has to consider if the court doesn't terminate, what would be the risk of harm if returned to the father. During the time he's known the mother he's worked a total of a legitimate job for two days by his own testimony. The other money he was earning, he was dealing drugs. Now to me, he didn't care about these children, he was interested in dealing drugs. He has a six [five] week old and a year old toddler in the home when the arrests occurred and they have marijuana, cocaine, paraphernalia, and a loaded weapon in the home.

. . . .

Then looking at the other part of the problem we have is what was the condition of the home when these children were living in it irregardless [sic] of the drugs. They're in a home that's filthy with no running water. They are not taking care of these children; there's no indication that they're going to change and take care of them when they get out. These children at their tender ages need to go on to permanency and not wait another year, or two, or three years to see if they may get their acts together.

In the subsequent written order, the trial court found that terminating appellant's parental rights was in the child's best interest and was justified on two grounds: (1) "that the juvenile has

been adjudicated by the Court to be dependent-neglected and has continued out of the custody of the parents for twelve (12) months and, despite a meaningful effort by the Department to rehabilitate the parents and correct the conditions which caused removal, those conditions have not been remedied by the parents"; and (2) "Furthermore, the father has significant criminal drug charges and has received a ten (10) year sentence. From the juvenile's viewpoint, the father could not achieve reunification within a reasonable time."

We have held that when the issue is one involving the termination of parental rights, there is a heavy burden placed on the party seeking to terminate the relationship. *Jefferson v. Arkansas Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004). Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* A circuit court may terminate parental rights if the court finds by clear and convincing evidence that termination is in the child's best interest, considering the likelihood that the child will be adopted and the potential harm the child would suffer if returned to the parent's custody; and finds by clear and convincing evidence that at least one statutory ground for termination exists. *See Latham v. Arkansas Dep't of Health and Human Servs.*, 99 Ark. App. 25, 256 S.W.3d 543 (2007); Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2008). One of the grounds included in the statute is that the child "has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent." Ark. Code Ann. § 9-27-341(b)(3)(b)(i)(a). Another ground is that the "parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life." Ark. Code Ann. § 9-27-341(b)(3)(B)(vii).

When the burden of proving a disputed fact is by clear and convincing evidence, the question we must answer on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Malone v. Arkansas Dep't of Human Servs.*, 71 Ark. App. 441, 30 S.W.3d 758 (2000). In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

■ We hold that the trial court did not err in terminating appellant's parental rights on the ground that appellant was sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the child's life. First, we clarify for the sake of the dissenting judges that the trial court did indeed terminate appellant's rights on this ground. It was argued, without objection, as a ground for termination at the hearing by counsel for DHS, and it is apparent from the trial court's oral remarks and the written order that this ground was a basis for the trial court's decision. Although the trial court did not quote the statutory language in its exact form, the court's meaning could not be more clear. Moreover, appellant addresses this ground in his brief.

■■ Secondly, we cannot say that the trial court's finding is clearly erroneous. Appellant was sentenced to concurrent terms of ten years in prison. The child in this case was ten months old when appellant received the ten-year sentence and nineteen months old at the time of the termination hearing, when appellant had served only eleven months of his sentence. For a child so young as TF, the sentence appellant received without question constitutes a substantial period of his life. Appellant argues, however, that the term of his imprisonment is not determinative, citing *Crawford v. Arkansas Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997), where it was said that "[a]lthough imprisonment imposes an unusual impediment to a normal parental relationship, we have held that it is not conclusive on the termination issue." Appellant has taken this familiar statement of law out of context. In *Crawford*, the father's parental rights were not terminated on the ground that he had received a substantial prison sentence.[3] Crawford's rights were terminated on the entirely different ground that he had willfully failed to provide significant material support for his children and to have meaningful contact with them. Thus, the statement in *Crawford* that imprisonment is

---

[3] In *Crawford v. Arkansas Dep't of Human Servs.*, *infra*, the father had been sentenced to ten years in prison with five years suspended. This sentence would not have served as a ground for termination because the statute in effect at that time defined "substantial period" as "a sentence, not time actually served, of no less than fifteen years, none of which has been suspended." Ark. Code Ann. § 9-27-341(2)(H)(ii) (Repl. 1998). In its current form, Arkansas Code Annotated § 9-27-341(b)(3)(B)(viii) requires only that the parent be sentenced to a substantial period of the juvenile's life, but it does not set a minimum term of imprisonment.

not controlling is pertinent when the issue involves the willful failure to provide meaningful support and to maintain meaningful contact, or the like. *See also, e.g., Linker-Flores v. Arkansas Dep't of Human Servs.*, 364 Ark. 224, 217 S.W.3d 107 (2005) (imprisonment not controlling but does not toll parental responsibilities when considering the parent's failure to remedy the conditions that caused removal); *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984) (incarceration not controlling on the issue of abandonment); *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976) (incarceration not controlling on the issue of abandonment). However, this statement of law has no particular application when the very ground at issue involves a prison sentence that constitutes a substantial period of the child's life. When that ground is under consideration, the length of the prison sentence can be determinative of the termination decision.

Although the statute speaks in terms of the sentence received by the parent, the trial court addressed appellant's wait-and-see argument regarding the possibility that he might be released on parole in six months.[4] The trial court found, however, that appellant's release from prison could not be predicted with certainty and that, even if appellant were released from prison when he claimed, the child could not be returned to him immediately or within a reasonable time thereafter. In making this determination, the trial court considered appellant's demonstrated failings as a parent, which included evidence that appellant dealt drugs instead of working and evidence showing the deplorable condition of the home. In all, the court reasoned that a prolonged delay, possibly spanning another year or perhaps more, was not in the best interest of a child who was nineteen months old and who had been in foster care since he was five weeks old.

These are worthy and pertinent considerations. The trial court's findings addressed the issue of the best interest of the child and were consistent with the stated intent of the termination statute, which is "to provide permanency in a juvenile's life in all circumstances where return to the family home is contrary to the

---

[4] In a footnote, appellant's counsel advises that appellant has been released on parole and is now living in Blytheville. It is not proper for counsel to include this statement in his brief, and this belated information can play no part in our decision. It is axiomatic that we do not consider matters outside the record to determine issues on appeal. *Peterson v. Dean*, 102 Ark. App. 215, 283 S.W.3d 610 (2008).

juvenile's health, safety or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark. Code Ann. § 9-27-341(a)(3). From our review of the record as a whole, we are convinced that the trial court's decision is not clearly erroneous. Therefore, we affirm the trial court's best-interest determination and the finding that appellant was sentenced for a period of time that constituted a substantial period of the child's life. Although we consider DHS's reunification efforts woefully inadequate, that issue is moot because only one ground is necessary to terminate parental rights. *Lee v. Arkansas Dep't of Human Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008).

PITTMAN, C.J., GLADWIN and HUNT, JJ., agree.

HART and BAKER, JJ., dissent.

JOSEPHINE LINKER HART, Judge, dissenting. I agree with Judge Baker that this case should be reversed, but write separately to make two points. First, the basis for the trial court's conclusion that custody could not be regained by Fields within a reasonable time was largely created by DHS's inaction, as DHS knew about Fields's whereabouts and his status as T.F.'s biological father and did nothing to make him a part of the case until it assumed that termination of his parental rights was a fait accompli. Fields was not even represented by counsel until December 5, 2007, not two weeks before the December 21, 2007, termination hearing. Of course, as Judge Baker so clearly states, no reunification services were offered. DHS did not even make the effort to ascertain Fields's date of release from incarceration, which should have been a key element in their case. The majority has, however, overlooked this glaring failure by speculating, despite Fields's testimony to the contrary, that the time for his release would be too far in the distant future to provide "permanency" for T.F.

Furthermore, although the actual time remaining on Crawford's sentence was not proved at the hearing to be "a substantial period of the juvenile's life," as specified by Arkansas Code Annotated section 9-27-341 (b)(3)(B)(viii) (Repl. 2008), the majority creates out of whole cloth a legal theory to work around this failure of proof through a twisted interpretation of the holding in *Crawford v. Arkansas Department of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997). In *Crawford*, the supreme court expressly

states, consistent with two other cases, that imprisonment is "not conclusive on the termination issue." 330 Ark. at 157, 951 S.W.2d at 313. While the supreme court affirmed the termination, it noted that the appellant not only faced an additional four years on his sentence, he was incarcerated for sexually abusing the half-sister of his two children. Obviously, the instant case is distinguishable.

My second point is of broader nature. I think the State of Arkansas has made a fundamental error in how to approach these cases. The basic terminology involved proves this: we call these actions "termination of parental rights." In effect, they are termination of parental *responsibility*. The goal of this state should not be to punish those whom we perceive to be bad parents, but to ensure that they carry out their basic responsibility to support and nurture the children that they bring into this world. I do not dispute that almost all the parents of the children in DHS custody are part of the problem. We as a society need to make them part of the solution, not absolve them of that responsibility and leave them unencumbered to produce more offspring. In this case, Fields, albeit belatedly, stepped forward to assume responsibility for the child he fathered. We should not penalize him for doing this — indeed, we should expect nothing less.

KAREN R. BAKER, Judge, dissenting. As the majority acknowledges, the department *did not offer Fields any services.* (Emphasis added.) Appellant's counsel correctly argued at the conclusion of the hearing that Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2008) requires DHS to prove that it put forth a meaningful effort to rehabilitate the parent and correct the conditions that caused the removal. The majority reasons that the issue is moot because only one ground is necessary to terminate parental rights, and, that despite the trial court's failure to properly identify the statutory language, the trial court correctly found that appellant's incarceration prevented the father from achieving reunification within a reasonable time. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(viii).

In support of this conclusion, the majority relies upon Angela Carvey's recommendation of termination of Fields's parental rights because the foster home was the only home T.F. knew. She also asserted that T.F. was adoptable and that the foster family had expressed interest in doing so. According to Carvey, the only part of the case plan Fields had completed was to resolve his criminal charges. On cross-examination, Carvey denied that the department had a policy of automatically seeking termination of

parental rights any time a parent is incarcerated. She also said that she was unaware of any case where the department did not seek termination but instead waited for the parent to be released. The only issue before this court is whether there is sufficient evidence to support the circuit court's decision. The court found that DHS had proven two grounds for termination of Fields's parental rights: that the children had been adjudicated to be dependent-neglected and had continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions had not been remedied by the parent, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a), and that Fields was sentenced to a period of time that constitutes a substantial period of the juvenile's life and is still subject to that sentence. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(viii).

The first ground found by the circuit court, based on section 9-27-341(b)(3)(B)(i)(a), required proof that T.F. had been adjudicated dependent-neglected, that he had remained out of his parents' custody for more than twelve months, that DHS made reasonable efforts to provide services, and that the conditions that caused T.F.'s removal had not been remedied. While the majority reasons that the issue is moot, the circuit court's finding that all four elements had been met is clearly erroneous because the DHS caseworker testified that no services were offered to Fields. Fields testified that while incarcerated he completed parenting classes, a substance-abuse program, and an anger-management program without assistance from DHS. Fields testified that he had a place to live and transportation lined up. However, DHS did not determine whether this would be an adequate home for T.F. Therefore, Fields's parental rights cannot be terminated based on section 9-27-341(b)(3)(B)(i)(a).

The majority reasons that the length of the prison sentence can be determinative of the termination decision and holds that the prison sentence in this case constitutes a substantial period of the child's life. It finds that the possibility of parole within a few months was inconsequential and relies upon the trial court's reasoning that the delay "possibly spanning another year or perhaps more, was not in the best interest of a child who was nineteen months old and who had been in foster care since he was five weeks old."

I dissent to point out that our review of the trial court's determination that the sentence in a criminal proceeding would

constitute a substantial period of the juvenile's life should be limited neither to the length of the child's current years lived nor by the years left to emancipation. Rather, we should focus upon the full life expectancy of the juvenile and the length of the incarceration in relation to that life expectancy.

According to the Child Welfare League of America (CWLA), approximately 150,000 teens are in foster care.[1] About 20,000 of these older youth "age out" of foster homes and institutions each year. *Id.* The age at which foster care youth must leave the system varies from state to state. *Id.* CWLA reports that at least 22 states have set that age at 21; Massachusetts has the option to age out youth at 23. Nineteen states, including Arkansas, age out foster care youth at 18. *Id.* Many teens also leave the system prior to the "official" emancipation age and try to make a go of living on their own. *Id.* According to the National Alliance to End Homelessness, in some areas of the country as many as 60 percent of homeless people have a foster care history. *Id.* Many never complete high school and go on welfare. *Id.* About one-quarter of the men end up incarcerated. *Id.* In 1991, the U.S. Department of Health and Human Services found that only one in six of the teens they tracked who had recently left care was completely self-supporting. *Id.*

Statistics such as these indicate that many of these children, from whom the state permanently separates their parents, leave our care and gravitate to homeless shelters, prison, and welfare. When we consider the entire life of the child in this case, another year spent in determining whether reunification with his father could be achieved would not have been significant. In fact, the time frame would have only been a few short months. No services were provided to this father. While we have repeatedly said that few consequences of judicial action are so grave as the severance of natural family ties, *see Osborne v. Ark. Dep't of Human Servs.*, 98 Ark. App. 129, 252 S.W.3d 138 (2007), we should also be cognizant that the grave consequences of that severance extends far beyond the juvenile years of the child life. In this case, the father sought and completed classes with no help or support from the department. The law favors preservation, not severance, of natural familial bonds. *See Santosky v. Kramer*, 455 U.S. 745 (1982); *Benedict*

---

[1] *Almost Home*, by Kendra Hurley, Shelterforce Online, Issue 125, September/October 2002; National Housing Institute, http://www.nhi.org/online/issues/125/independence.html.

*v. Ark. Dep't of Human Servs.,* 96 Ark. App. 395, 242 S.W.3d 305 (2006). Whether Fields would ultimately be successful in being reunited with his son, we cannot know. Nonetheless, the State of Arkansas owes this child the opportunity to have that chance.