SLIP OPINION

Cite as 2015 Ark. 356

# SUPREME COURT OF ARKANSAS

No. CV–15–156

| | |
|---|---|
| GEORGE BRUMLEY<br><br>                                    APPELLANT<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES<br><br>AND<br><br>G.B., MINOR CHILD<br>                                    APPELLEES | Opinion Delivered October 8, 2015<br><br>APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. J12-785-3]<br><br>HONORABLE STACEY A<br>ZIMMERMAN, JUDGE<br><br><br>AFFIRMED; COURT OF APPEALS<br>OPINION VACATED. |

**HOWARD W. BRILL, Chief Justice**

Appellant George Brumley appeals an order of the Washington County Circuit Court terminating his parental rights to his son, G.B., pursuant to Arkansas Code Annotated section 9-27-341 (Supp. 2013). For reversal, Brumley argues that the circuit court erred in terminating his parental rights on two separate grounds and in finding that termination was in the child's best interest. Pursuant to Arkansas Supreme Court Rule 1–2(b)(5) (2015), we have jurisdiction because this appeal presents a significant issue needing development of the law. We affirm.

## I. *Facts*

On October 7, 2012, appellee Arkansas Department of Human Services (DHS) received a call from Washington County Deputy Sheriff Eric Bryant, who reported that

Angela Poss, G.B.'s biological mother, had been arrested and charged with terroristic threatening, third-degree assault on a family member, and second-degree endangering the welfare of a minor. Deputy Bryant stated that Poss assaulted her mother during the child's birthday party in the presence of the minor and his younger half sister, C.F.[1] At the time of Poss's arrest, Brumley was incarcerated at the Arkansas Department of Correction.[2]

That same day, on October 7, 2012, DHS exercised a seventy-two-hour hold on the children because they had been left without a legal caregiver at the time of the removal. DHS filed a petition for emergency custody, and the circuit court placed custody of the children with DHS. The circuit court later entered a probable-cause order finding the children dependent-neglected. Following an adjudication hearing, the court ruled that the children would live with their aunt, Amanda Green, and stated that Brumley could send appropriate letters and could contact his son by phone. The court ordered Brumley to participate in individual counseling, to follow the recommendations of the counselor, to keep counseling appointments, to refrain from using illegal drugs and alcohol, to obtain and maintain stable housing and employment, to maintain housing for himself and the children, and to follow the case plan and court orders.

After a review hearing on May 8, 2013, the circuit court subsequently entered a review order, filed May 9, 2013, and ruled that Brumley had not complied with the court orders and

---

[1]This appeal does not concern G.B.'s half sister, C.F.

[2]According to a DHS court report, Brumley was incarcerated at the time as a habitual offender for fraud, possession of drug paraphernalia, theft, and forgery.

2

case plan. Specifically, the court found that Brumley remained incarcerated, while noting that he had taken numerous parenting and self-improvement classes in prison. The circuit court ordered Brumley to submit to random drug screens when released from prison, to have supervised visits with both children one time per week for one hour, and to file a petition for paternity. The case goal remained reunification.

The case proceeded to a permanency-planning hearing on September 25, 2013. Following the hearing, the circuit court entered an order that same day, finding that Brumley was the child's legal father and that he had not complied with all the court orders and the case plan. The circuit court ruled that Brumley remained incarcerated and had minimally participated in reunification services. The circuit court noted that Brumley had participated in parenting classes, life-skills classes, and sobriety classes in prison but that he could not care for the child because of his imprisonment. The court changed the case goal from reunification to adoption.

On October 18, 2013, DHS filed a petition for termination of parental rights, stating the following statutory grounds:

> (i) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.
>
> . . . .
>
> (iii) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement

of the juvenile in the custody of the parent.

. . . .

(iv) The parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life[.]

At the termination-of-parental-rights hearing on December 13, 2013, Miranda Collins, a DHS caseworker, testified that the child lived with Elizabeth and Lee Francis, his aunt and uncle; that he was in special-education classes; and that the Francises wished to pursue adoption of the child and his sister. Collins testified that Brumley had written letters to his son and had taken parenting classes, but that he had been incarcerated throughout the entirety of the case and had no plans for stable housing or employment upon discharge. She also stated that he had never submitted to a drug screen. She testified that she believed it was in the child's best interest to have Brumley's rights terminated because she did not "want [him] out in the air about where [he] will be."

Brumley testified that he had supported his son while in prison by calling him and by sending checks, gifts, and letters. He stated that he had participated in three parenting classes, drug-treatment classes, and PALS, a faith-based program that taught life skills. He testified that he believed that he would reside at his mother's house, his sister's house, or a halfway house after his release date. On cross-examination, Brumley admitted that he last saw his son in 2007 and that out of nine years of the child's life, Brumley had lived with him for only six months.

Following the termination hearing, the circuit court entered an order, filed December 20, 2013, terminating Brumley's parental rights and granting DHS the power to consent to adoption. The circuit court's ruling was based on two grounds alleged in DHS's termination

petition. Those two grounds included the twelve-month ground, found at Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(a), and the subsequent-factors ground, found at Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a). Brumley timely filed his notice of appeal, and the court of appeals issued *Poss v. Arkansas Department of Human Services*, 2014 Ark. App. 514, 443 S.W.3d 594 (granting Poss's counsel's motion to withdraw, denying Brumley's counsel's motion to withdraw, and ordering his appeal to be rebriefed as a merit case). In a second opinion, *Brumley v. Arkansas Department of Human Services*, 2015 Ark. App. 90, 455 S.W.3d 347, the court of appeals affirmed the circuit court's ruling terminating Brumley's parental rights. Brumley filed a petition for review with this court, and we accepted Brumley's petition. We review the circuit court's order following the grant of a petition for review as if the matter were originally filed in this court. *See, e.g.*, *Machen v. Machen*, 2011 Ark. 531, 385 S.W.3d 278. We now turn to Brumley's appeal.

II. *Applicable Law*

For the sole point on appeal, Brumley argues that the circuit court erred in terminating his parental rights on two grounds. First, Brumley contends that the circuit court erred in terminating his parental rights on the twelve-month ground and on the subsequent-factors ground because he was incarcerated at the time of the child's removal. Second, Brumley argues that the circuit court erred in finding that it was in the child's best interest to terminate the father's parental rights. DHS and G.B. jointly respond that the circuit court properly terminated parental rights on both statutory grounds and in its best-interest analysis.

Termination of parental rights is an extreme remedy and in derogation of the natural

SLIP OPINION

rights of the parents. *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). In cases involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *See Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984). A proceeding to terminate parental rights is a two-step process that requires the circuit court to find by clear and convincing evidence that a parent is unfit and that termination is in the best interest of the child. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). The first step is that DHS must prove one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). When determining the best interest of the juvenile, the circuit court takes into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Arkansas Code Annotated section 9-27-341(b)(3) requires a circuit court's order terminating parental rights to be based on clear and convincing evidence. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Baker v. Ark. Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on

appeal is whether the circuit court's finding was clearly erroneous. *Payne v. Ark. Dep't of Human Servs.*, 2013 Ark. 284. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *See id.* This court gives a high deference to the circuit court because that court is in a far superior position to observe the parties before it and to judge the credibility of the witnesses. *See id.*

A. Ground for Termination

Section 9-27-341 provides for the termination of parental rights upon petition by DHS. Subsection (b)(3) sets forth the grounds for terminating parental rights and includes the imprisonment ground, which states that "[t]he parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life." Ark. Code Ann. § 9-27-341(b)(3)(B)(viii). We note that the prison sentence, not the potential release date, determines whether this statutory ground is satisfied. *Bowman v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 477.

Whether parental rights should be terminated on the imprisonment ground depends on the particular facts and circumstances of each case. *See, e.g.*, *Moore v. Ark. Dep't of Human Servs.*, 333 Ark. 288, 969 S.W.2d 186 (1998) (affirming the termination of parental rights based on a twenty-eight-year prison sentence when the child was one year old); *Basham v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 243, 459 S.W.3d 824 (affirming the termination of parental rights based on a twenty-year prison sentence when the child was four years old); *Hill v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 108, 389 S.W.3d 72 (affirming the

termination of parental rights based on a three-year prison sentence when the child was two years old and reasoning that, by time the parent was released from prison, the child would have spent half of her life in foster care); *Fields v. Ark. Dep't of Human Servs.*, 104 Ark. App. 37, 289 S.W.3d 134 (2008) (affirming the termination of parental rights based on ten-year concurrent prison sentences when the child was ten months old); *Thompson v. Ark. Dep't of Human Servs.*, 59 Ark. App. 141, 954 S.W.2d 292 (1997) (affirming the termination of parental rights based on a forty-year prison sentence when the children's ages were ten and nine years). *Cf. Washington v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 13 (reversing and holding that counsel's argument did not meet the requirements of no-merit appeals in termination cases because he addressed the incarceration ground in a cursory and unsatisfactory fashion).

In the instant case, DHS alleged this imprisonment ground in its petition, but the circuit court failed to rule on this ground in its termination order. Nevertheless, we may reach this issue in our de novo review. While our de novo review does not mean that the findings of fact of the circuit court are dismissed out of hand and that the appellate court becomes the surrogate circuit court, it does mean that a complete review of the evidence and the record may take place as part of the appellate review to determine whether the trial court clearly erred either in making a finding of fact or in failing to do so. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). This de novo standard opens the entire record for our review. *Conagra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000). Moreover, under this standard of review, an appellate court is not constrained by the trial court's

SLIP OPINION

SLIP OPINION

rationale, but may review the record for additional reasons to affirm. *See State of Wash. v. Thompson*, 339 Ark. 417, 6 S.W.3d 82 (1999); *see also Fenstermacher v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 88, 426 S.W.3d 483; *Bradbury v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 680, 424 S.W.3d 896. It is well established that this court may affirm a trial court when it has reached the right result, although it may have announced a different reason. *See Powell v. Lane*, 375 Ark. 178, 289 S.W.3d 440 (2008); *see also Allen v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 288, 384 S.W.3d 7; *Smith v. Ark. Dep't of Human Servs.*, 100 Ark. App. 74, 264 S.W.3d 559 (2007). Thus, we review the record in the present case to determine if the evidence supports affirmance.

Our de novo review of the evidence convinces us that the imprisonment ground warrants termination of Brumley's parental rights. The record reveals that the child was born in 2004. At the termination hearing in 2013, after the child had turned nine years old, Brumley testified that he had not seen his child since "probably 2007." Brumley further testified that his son had lived with him for only six months. In its December 20, 2013 termination order, the circuit court stated that "George Brumley has remained incarcerated throughout the case. He has not seen [his child] since 2007, when he went to prison." The court further stated that Brumley "has only resided with his son [six] months back in 2006. [The child] does not have a relationship with his father." While incarceration is not, in and of itself, conclusive on the termination issue, imprisonment does not toll a parent's responsibilities toward his or her children. *Linker-Flores v. Ark. Dep't of Human Servs.*, 364 Ark. 224, 217 S.W.3d 107 (2005). Based on our de novo review of the record, we conclude

under these circumstances that Brumley's seven years of incarceration during the life of his nine-year-old son constitutes a *substantial* period of the child's life and that sufficient evidence supports this ground for termination.

Because DHS is required to prove only one statutory ground for termination, *see* Arkansas Code Annotated section 9-27-341(b)(3)(B), it is not necessary for us to consider Brumley's arguments concerning other statutory grounds for termination.

## B. Best-Interest Analysis

Brumley further challenges the circuit court's finding that termination of his parental rights was in G.B.'s best interest. The two factors to consider in determining best interest are the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). Here, Brumley concedes in his brief that the child is adoptable. At the termination hearing, Collins testified that the child's aunt and uncles wished to adopt him and, as a result, the circuit court properly found that G.B. is adoptable. *See Thompson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 124 (stating that testimony from a caseworker or an adoption specialist that the children were adoptable is sufficient). Thus, we conclude that the adoptability prong is satisfied.

Next, Brumley challenges the circuit court's finding of potential harm. He claims that the record is devoid of any potential harm to his son that would prevent him from seeking custody and placement upon his release from incarceration. The potential-harm analysis must be conducted in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *See Lunon v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 647.

Brumley argues that this case is similar to *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851, in which the custodial grandmother stated her desire that the child have continued contact with his parents. Brumley also notes that the father in *Cranford* was incarcerated at the time of the termination hearing. However, Brumley's case is distinguishable from *Cranford*. In *Cranford*, the court of appeals found no significant potential harm in allowing the father to visit his son and to pursue reunification efforts. *Id*. at 10, 378 S.W.3d at 856. The court of appeals noted that the father had "demonstrated stability in housing and employment before his incarceration, and testified that he will be able to regain that stability after his release, which was anticipated to be only six weeks from the termination hearing." *Id*., 378 S.W.3d at 856. The court did not agree that termination would necessarily provide greater stability in the child's life. *Id*., 378 S.W.3d at 857. Here, Brumley has been incarcerated for most of the child's life and has no relationship with his son. He expected to be released six months after the termination hearing; however, he did not ask for custody of his son at the hearing, but only for a chance to "work with the custodians" in order to get to know his son. On appeal, Brumley now seeks "custody and/or placement" of his son, unlike the situation in *Cranford* in which the child stayed in his grandparent's custody where he was to "remain whether or not his parents' rights [were] terminated in [the] proceedings." *Id*., 378 S.W.3d at 857. Nevertheless, the stability and reasonable hope for reunification that the court of appeals found in *Cranford* is clearly lacking here.

In the instant case, Collins testified that Brumley remained incarcerated and, as a result,

11

lacked essential components of the case plan, including stable housing and employment. We have stated that permanency is the objective of the termination procedure and cannot be lightly discounted. *Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397 (2001). Thus, we conclude that this evidence of potential harm, combined with the child's adoptability, supports the circuit court's ruling that termination of Brumley's parental rights was in the child's best interest.

Affirmed; court of appeals opinion vacated.

WOOD, J., and Special Justice ROBERT S. SHAFER concur.

HART, J., dissents.

WYNNE, J., not participating.

**RHONDA K. WOOD, Justice, concurring.** I join the majority opinion, but write separately to address the circuit court's decision to terminate on the "subsequent factors" ground. I would affirm on this statutory ground as well as on the incarceration ground.

In Arkansas, we have a very complex statutory scheme for how courts handle dependency-neglect cases. Ark. Code Ann. §§ 9-27-301 et seq. (Repl. 2009 & Supp. 2013). There are specific statutory grounds that a circuit court must find before terminating an individual's parental rights. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2013). One of those grounds is commonly referred to as "subsequent factors" or "other factors." Specifically, the language is as follows:

> That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or

indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a). Broken down into its constituent elements, the subsequent-factors ground requires the court to find the following:

(1) subsequent issues arose after the original petition was filed that demonstrate it is contrary to the juvenile's health, safety, or welfare to place the child with that parent;
(2) appropriate family services were offered; and
(3) parent is indifferent or lacks the capacity to remedy the
    (a) subsequent factors or
    (b) rehabilitate the parent's circumstances that prevent placement of the juvenile with that parent.

Turning to the facts of the present case, Brumley is correct in his argument that incarceration alone cannot be a subsequent factor because his incarceration predated the dependency-neglect petition. However, this court has stated repeatedly for decades that imprisonment does not toll a parent's responsibilities to his or her child. *See Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976). Here, there is ample evidence that the subsequent-factors statutory ground applies to this case.

First, subsequent to the petition, the court specifically ordered Brumley to accomplish certain goals in order to provide a home for his child. The court ordered him to obtain individual counseling, not use illegal drugs or alcohol, obtain and maintain stable housing and employment adequate for him and his child, maintain a safe home for him and his child, complete twelve hours of parenting classes, demonstrate an ability to protect his child and keep him safe from harm, and follow the case plan and court orders. Brumley failed to meet these requirements, and this failure to comply with court orders is a subsequent factor that prevented the court from returning the juvenile to his custody. When a court orders a child

SLIP OPINION

removed from a custodial parent, the court must look at both parents with the hope that one of them can be a fit and proper custodian for the child. While the noncustodial parent may not have caused the removal, the court often must turn to that parent, subsequent to the removal, and order that parent to provide a home for that child. Failure to do so becomes a subsequent factor.

Second, the court must look to whether the parent's failure to remedy the subsequent factors occurred despite appropriate family services being offered. While the record is not specific about the precise services offered, the circuit court made repeated findings at multiple hearings that the Department of Human Services had provided reasonable family services to Brumley. Brumley failed to object when the court made this finding and did not argue at termination that reasonable family services were not provided. He does not raise this issue until his appellant's brief, and we will not entertain an argument not raised to the circuit court. *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104.

Third, Brumley lacked the capacity to remedy the subsequent factors because he remained incarcerated and could not provide a home for his child. In addition, he was indifferent to the circumstances because he never asked the court for custody. Rather, he asked for time, after his release from prison, to get to know his son, manifesting an indifference to obtaining permanent custody and providing his child a permanent home.

The goal of dependency-neglect cases is to obtain a permanent, safe home for the involved children. Ark. Code Ann. § 9-27-338 (requiring a permanency-planning hearing after a juvenile has been in an out-of-home placement for 12 months). The best outcome is

to rehabilitate the parent(s) so they are able to properly care for their children. However, an incarcerated parent does not get a free pass. A non-incarcerated parent has 12 months to provide a permanent, safe home. Incarcerated parents should not have extra time by virtue of their poor choices, especially when the effect would delay permanent placement for the juvenile. And here, the child had been in an out-of-home placement since October 2012. Even if Brumley had been released on his scheduled release date in September 2014, he would have been unable to immediately provide his child with a permanent home and in fact expressed no desire to do so. Thus, even if Brumley would have been ready to take custody a month after release, the child would have been living outside of the home for over two years.

Special Justice ROBERT S. SHAFER joins.

**JOSEPHINE LINKER HART, Justice, dissenting.** I respectfully dissent because conspicuously absent from the majority's opinion is a frank discussion of what should be the most pivotal fact in this case—George Brumley had nothing to do with the removal of his child, G.B., from the custody of the child's mother. Conversely, the record shows that Brumley, although incarcerated, was doing everything he could to liberate G.B. from ADHS custody. After ADHS intervention, caseworker Miranda Collins admitted that she had never contacted Brumley in prison, much less provided, or even offered reunification services.

Accordingly, our statutory scheme for terminating his parental rights simply does not fit his situation.[1]

In my view, the majority's reliance on the fact that Brumley was incarcerated as its sole statutory ground for termination is unsound. In *Crawford v. Arkansas Department of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997), this court expressly stated that imprisonment is "not conclusive on the termination issue." *Id.* at 157, 951 S.W.2d at 313. Today, the majority is apparently saying that *any* prison sentence is sufficient ground for termination of parental rights; the requirement that the sentence constitutes a significant amount of time in a child's life, has ceased to have any meaning. The majority's conclusion that whether a prison sentence constitutes a significant amount of time in a child's life now apparently hinges on the amount of prison time that a parent was originally sentenced to, not how much time remained before he or she could assume custodial responsibility for his child. None of the cases support this extraordinary change in the law. In *Moore v. Arkansas Department of Human Services*, 333 Ark. 288, 969 S.W.2d 186 (1998), the father's parental rights were terminated after he had received a 28-year prison sentence for battery of his then five-month-old child who had suffered a fractured skull, fractured ribs, and a fractured upper arm. In *Basham v. Arkansas Department of Human Services*, 2015 Ark. App. 243, 459 S.W.3d 824, the

---

[1]I am mindful that Arkansas Code Annotated section 9-27-341 has subsequently been amended, effective July 15, 2015. It addresses the situation in which an innocent, non-custodial parent is incapable of taking custody of his or her child. New subparagraph (B)(i)(b) would arguably provide grounds for the termination of Brumley's parental rights. It, however, has no applicability to the case before us. Of course, it is worth remembering that ADHS has done nothing to facilitate placement of G.B. with Brumley.

father's parental rights were terminated after the child had been removed from the father's home after the police conducted a raid and discovered methamphetamine and firearms, which resulted in the father receiving a twenty-year prison sentence. In *Hill v. Arkansas Department of Human Services*, 2012 Ark. App. 108, 389 S.W.3d 72, the mother's parental rights were terminated when she was incarcerated on a parole violation. She was on parole because she had pled guilty to abusing her child, and, at the time of the hearing, the court found that the mother would not be released for another year and a half. In *Fields v. Arkansas Department of Human Services*, 104 Ark. App. 37, 289 S.W.3d 134 (2008), the father, whose parental rights had been terminated, was *beginning* to serve a ten-year prison sentence to be followed by a ten-year suspended imposition of sentence. Fields was responsible for his child being taken into ADHS custody—he, along with child's mother, was convicted of various drug offenses committed in the presence of the children. Further, Fields admitted that he had committed disciplinary infractions while in prison, jeopardizing an early parole date, which was, at best, two years in the future. In *Thompson v. Arkansas Department of Human Services*, 59 Ark. App. 141, 954 S.W.2d 292 (1997), the mother's parental rights to her four children were terminated after she had received a forty-year prison sentence for raping her two older children. In short, all of the parents whose parental rights were terminated in the cases that the majority had *directly caused* the removal of their child from *their* homes, and were close to *beginning* a lengthy prison sentence.

Conversely, Brumley is close to the end of his prison sentence, having but six months left before his parole. His disciplinary record is not an impediment to his pending release.

Moreover, Brumley was not responsible for the removal of G.B. from the *mother's* home. Accordingly, ADHS has not proved the statutory ground that the majority relies on.

Although not discussed by the majority, Brumley persuasively argues that the other potential statutory grounds are equally unavailing. I agree with Brumley that the circuit court erred in finding that the 12-month-failure-to-remedy ground was a basis for terminating his parental rights because he was not responsible for the conditions that caused ADHS to take custody of G.B. For this ground to apply, at a minimum, he had to contribute to the cause of removal.

I likewise find persuasive Brumley's argument that the "subsequent factors" ground does not support the termination of his parental rights because he was incarcerated when G.B. was removed from his mother's custody, and he was incarcerated when the termination hearing took place. Accordingly, his incarceration was "known" when G.B. was removed from the custodial parent's home and did not arise subsequent to ADHS filing its petition for custody. Further, I agree that the record shows that he did not demonstrate indifference to remedying the situation. He took parenting classes, established paternity, corresponded with the child, and engaged in substance-abuse treatment. All of these efforts were made without ADHS assistance—the caseworker admitted that she had never contacted Brumley during the dependancy-neglect case.

While it is true, as Brumley concedes, that he did not have independent housing or employment, he did participate in work release and sent all the money to the G.B.'s mother before G.B. was taken into ADHS custody, and he has attempted to work with child-support

enforcement. Accordingly, his case is unlike *Friend v. Arkansas Department of Human Services*, 2009 Ark. App. 606, 344 S.W.3d 670, which ADHS urges us to find analogous. *Friend* is similar to the case at bar only to the extent that both appellants were in prison. However, in *Friend*, the appellant refused to accept that the mother was an alcoholic and had not rejected the possibility of reconciling with the mother and therefore again putting the child at risk. This is not a case in which the noncustodial parent is subsequently discovered to essentially be unfit as in *Lewis v. Arkansas Department of Human Services*, 364 Ark. 243, 217 S.W.3d 788 (2005).

Assuming, arguendo, that there is a valid statutory ground for terminating Brumley's parental rights, the best interest of the child does not dictate that the State of Arkansas impose this extreme solution. At the time of the termination hearing, G.B. was nine-years old. Although he had not resided with his father for a significant period of time, he was aware that he had a father; his mother, Angela Poss, testified that G.B. had a "fascination" with the idea that he had a father. She further testified, and it was not disputed, that Brumley was sending "significant support" for the child earned on work release. Brumley's uncontradicted testimony was that he had contacted child-support enforcement and insisted on sending twice what they recommended—$150 per week—to support G.B.

Contrary to the majority opinion, it was also uncontradicted that Brumley had a plan for his child upon Brumley's release from prison. Depending on whether he would be allowed to reside with his child, upon release, he planned to either move in with his mother and G.B., or leave the child with his mother and reside either with his sister or in a halfway

house, until he got his own residence. Finally, it was established that Brumley's mother had a relationship with G.B., and a termination of Brumley's parental rights constituted a termination of the child's relationship with his grandmother. In sum, G.B. will suffer the loss of his father, a considerable amount of child support—apparently more than what would be provided in a subsidized adoption, and a relationship with a grandmother who obviously loves him.

What the State is offering G.B. as compensation for these losses is the holy grail of parental-rights terminations: permanency. Or so it seems. While G.B. has been out of his mother's home for more than twelve months, the child's current placement had been in effect for only *eight weeks*. Foster mother Elizabeth Francis testified that she was still trying to find medical providers and set up appointments. Francis did testify that she was "wanting to pursue adoption of G.B. and his half sibling, but there is certainly a question as to whether the adoption could be accomplished before Brumley's release from prison. To put it mildly, in this case, "permanency" for G.B., or more accurately, the promise of permanency, does not seem to justify preventing G.B. from reuniting with his father and cutting off his relationships with all the members of his extended paternal family.

*Dusti Standridge*, for appellant.

*Tabitha McNulty*, for appellee.

*The Chrestman Group, PLLC*, by: *Keith Chrestman*, attorney ad litem for minor child.