Cite as 2024 Ark. App. 62

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-23-546

| | |
|---|---|
| MARIO RUGAMA<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered January 31, 2024<br><br>APPEAL FROM THE YELL COUNTY CIRCUIT COURT, SOUTHERN DISTRICT [NO. 75SJV-22-9]<br><br>HONORABLE TERRY SULLIVAN, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Mario Rugama appeals the order of the Yell County Circuit Court terminating his parental rights to his minor child, MC. On appeal, Rugama does not challenge the sufficiency of the evidence supporting the circuit court's findings regarding the statutory grounds for termination. Instead, he argues that the court's termination decision violated his due-process rights and that the court erred in finding that termination was in MC's best interest because DHS failed to act in a way that preserved the family unit. We affirm.

I. *Factual and Procedural Background*

DHS filed a petition for emergency custody and dependency-neglect on March 21,

2022, alleging that MC was dependent-neglected because of his mother's[1] drug use and because she left MC with an inappropriate caregiver while she was at the hospital giving birth to another child. In addition, Rugama, named in the petition as MC's putative parent, was incarcerated at the Faulkner County jail at the time with "multiple charges" pending. The court entered an ex parte order for emergency custody on March 22 and appointed counsel only for MC's mother, Kerrie Davis, because she was the person from whom custody was removed. In the court's probable-cause order of April 20, the court determined that Rugama is MC's legal parent and appointed him counsel.

Following the May 15 adjudication hearing,[2] which Rugama did not attend, the court found that MC was dependent-neglected due to parental unfitness, specifically citing Davis's methamphetamine use at the time of removal. In addition, the court found that

> there IS a non-custodial parent who is a legal parent of the juvenile, but does not have custody. Pursuant to section 9-27-327(a)(1)(B) of the Arkansas Code, the court finds that Mario Rugama is the non-custodial parent and DID contribute to the dependency-neglect of the juvenile because he was incarcerated at the time of removal. The court further finds that Mario Rugama is not a fit parent for the purposes of custody or visitation because he is still incarcerated at this time. For these reasons, the court finds that the juvenile cannot be safely placed in the custody of Mario Rugama.[3]

---

[1]When MC's mother, Kerrie Davis, was drug tested at the hospital, she was positive for methamphetamine and other illegal substances. Her parental rights to MC were also terminated by the circuit court, but she is not a party to this appeal.

[2]The order was not entered until July 19.

[3]The court found that Rugama is "a parent for purposes of the Arkansas Juvenile Code because he has signed an acknowledgement of paternity."

Both parents were ordered to comply with the case plan and attend parenting classes and counseling.

Rugama's absence was again noted at the August 19 review hearing. In the ensuing review order, the court continued the goal of the case as reunification. The court found that DHS had complied with the case plan and had made reasonable efforts to provide family services. It further found that "the parent"--without specifying which one--was "mostly compliant with the case plan and orders of the court."

A permanency-planning hearing was held on December 16. Rugama did not attend. At that time, the caseworker assigned to the case testified that Rugama had not participated in the case plan because he was incarcerated in the Arkansas Department of Correction (ADC) and had been incarcerated since the case was filed. Noting that Rugama had been found to be the "real father," the court noted that counsel would have to be appointed and that DHS would need to serve Rugama in the ADC. The court went on to find that "the parents" had not complied with the case plan and court orders. Specifically, the court found that Rugama had not participated in the case and had been "incarcerated throughout the life of the case." The court ultimately concluded that the goal of the case should be termination of parental rights and adoption.

DHS filed its petition for termination of parental rights on January 4, 2023. As grounds pertaining to Rugama, DHS alleged twelve months failure to remedy as to a noncustodial parent; failure to provide significant material support; sentencing in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's

3

life; and aggravated circumstances, in that there was little likelihood of successful reunification. DHS further alleged that there were persons interested in adopting MC and that he would be subject to potential harm if returned to Rugama's custody because he was "incarcerated and placement of the juvenile with him is contrary to public policy and is self-evident."

The termination hearing was held on April 21, 2023. This was the first hearing Rugama attended. At the outset of the hearing, Rugama's counsel moved for a continuance, arguing that Rugama had been "offered zero services" and had not had any visitation with MC. Counsel further noted that there were "still pending questions from the email that I sent back in January about possible family member information that was sent out." The court denied the continuance, noting that counsel had the right to question DHS about the lack of services for Rugama.

At the hearing, Rugama testified that he had been in the ADC since November 2021 serving a fifteen-year sentence for being in possession of methamphetamine and cocaine with purpose to deliver.

On cross-examination, Rugama explained that he had lived with his son for several stretches of time: from when MC was born until he was seven months old, at which time Rugama was sentenced to four years in prison; from his release date in 2014 until 2019, when he was again incarcerated; and from April to November 2021, when he went back to prison. Since the case had been opened in March 2022, he had not been able to see his son via either Zoom or other video visits. Although he said he had spoken to someone from DHS

when the case was opened, he testified that he had not had any contact with DHS since that time and had been offered no services. He said that he had completed parenting classes and had attended vocational training and stress-management classes as well. Rugama added that he had provided his attorney and a woman at DHS with his mother's contact information in case she might be interested in taking MC.[4] He conceded that he had not attended any previous hearings but claimed he had received only "maybe one or two of the motions."

Kiley Burge, the Yell County supervisor for the Division of Children and Family Services, testified that although DHS had had contact with Rugama during the case, she had not personally had contact with him. Burge said that she sent Rugama the case plans, but DHS had not attempted to arrange visitation between Rugama and MC while he was either in the Faulkner County jail or in the ADC because of his incarceration. She said there were no barriers to adoption for MC[5] and that placing MC in Rugama's custody would expose MC to potential harm because of Rugama's incarceration.

Rugama's counsel followed up with questions about the services that DHS had provided to him. Burge said that another caseworker, McKayla Whitley, had had contact with him at the beginning of the case, but she was not sure how many contacts had been

---

[4]On cross-examination by the attorney ad litem, Rugama said that he had given his attorney a list of people he wanted to be considered for placement of MC, including his mother, his sisters, and his aunt and uncle.

[5]During cross-examination by the ad litem, Burge added that MC was "doing great" with his foster family and had expressed that "that is where he wants to be." She noted that the foster family had expressed it wanted to be considered for his placement.

made. She reiterated that no visits had been attempted because of Rugama's incarceration, but she conceded that she did not confirm with either ADC or the Faulkner County jail that visitation would not be possible. She simply assumed that it would not be. Regarding services, she said she did not believe there was anything DHS could offer him while he was incarcerated. She acknowledged, however, that neither she nor anyone at DHS had reached out to the ADC to see if any services could be provided to Rugama during his incarceration, and she admitted that no one attempted to make any services available to him.

With respect to placing MC with family members, Burge recalled reaching out to Rugama's mother after receiving an email from Rugama's counsel. The mother was supposed to get Burge phone numbers of other family members, but Burge never heard back from her. She remembered seeing some other family members' names and phone numbers on the list but did not recall whether she reached out to them. She also did not recall why the mother was not being considered for placement. On cross-examination by the ad litem, however, Burge said she remembered talking to Rugama's mother about placement, but DHS "could not go forth with her," although she did not remember "what the issue was." Burge reiterated that Rugama's mother told her there were some other relatives and that she would contact Burge with those relatives' phone numbers, but Burge never heard back from her.

McKayla Whitley, the initial caseworker, testified that she spoke with Rugama shortly after MC had been removed, and he inquired about visitation. Whitley said she would look into it and then spoke with someone at the Faulkner County jail, who told her they did not allow in-person visits at that time. The jail suggested that Zoom visits might be available, but

6

the way the video room was set up, there could be several people in the room who it might not be "appropriate for a child to be having a Zoom visit" around. She said she also talked to the county jail about services; she was informed there were "no services that we could put in place there at the county jail."

The circuit court heard closing arguments from counsel, then announced that it was terminating Rugama's parental rights. In its subsequent written order entered on May 15, 2023, the court found that Rugama, having been incarcerated throughout the life of the case, had not participated in the case plan. More specifically, as to grounds, the court found that Rugama had abandoned MC, had been sentenced in a criminal proceeding for a period of time that would constitute a substantial period of MC's life, and had subjected MC to aggravated circumstances. Rugama timely appealed.

## II. *Standard of Review*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2023).

The order terminating parental rights must also be based on a showing by clear and convincing evidence of one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). *Drake v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 429, 675 S.W.3d 487. Clear

7

and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction of the allegation sought to be established. *Id.* On review, this court gives due deference to the opportunity of the circuit court to assess witness credibility and will not reverse termination unless the lower court's decision is clearly erroneous. *Posey v. Ark. Dep't Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Chastain v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 503, 588 S.W.3d 419. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

III. *Analysis*

A. Due Process

On appeal, Rugama does not challenge the circuit court's determination that DHS presented sufficient proof in support of the statutory grounds for termination, nor does he argue that there was insufficient evidence regarding either statutory prong––adoptability and potential harm––of the court's best-interest finding. These issues are therefore waived, and this court must affirm those findings. *See, e.g.*, *Benedict v. Ark. Dep't of Hum. Servs.*, 96 Ark. 395, 242 S.W.3d 305 (2006).

Instead, in his first argument, Rugama contends that it was erroneous for the circuit court to terminate his parental rights under the particular facts of this case when DHS "failed to (1) communicate with [him]; (2) ensure the provision of the case plan, pleadings, and

orders; and (3) secure his attendance or participation in any of the hearings prior to the termination hearing." In other words, Rugama asserts that he was deprived of his parental rights "in the complete absence of due process."

Specifically, Rugama complains that the court erred in finding that he contributed to MC's dependency-neglect because of his absence due to his incarceration, when the removal was occasioned by the mother's drug use. He also contends that although the court found that he was not in compliance with the case plan, there was no evidence that he was ever provided with a copy of the case plan. He asserts that although he was named as a party, he was never treated as a party, and DHS failed to offer him services, communicate with him, or explain what was expected of him as far as compliance with the case plan and court orders. This "complete lack of due process so poisoned the ultimate termination decision that any resulting prejudice cannot be written off as harmless error," he claims.

We acknowledge the concerns raised by Rugama's point on appeal, and we agree that the procedural history outlined above raises serious questions about DHS's efforts––or lack thereof––to notify Rugama of the proceedings, to ensure his participation in court proceedings, to provide the services that DHS is obligated to offer, and to reunify him with MC. Nonetheless, we are unable to reach the merits of Rugama's due-process arguments because he failed to raise them below. *See Chacon v. Ark. Dep't of Hum Servs.*, 2020 Ark. App. 277, 600 S.W.3d 131 (acknowledging DHS's failure to provide notice or services to an incarcerated father but holding that father's due-process argument could not be addressed because he failed to obtain a ruling on it below).

Although Rugama complained during his closing arguments that DHS had made no efforts to provide him services or otherwise communicate with him, these arguments were made in the context of challenging the statutory grounds for termination. Rugama never asserted that his due-process rights were violated by the proceedings below or the circuit court's ruling. We have repeatedly held that that we will not consider issues raised for the first time on appeal, even constitutional ones. *Lawrence v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 223, 548 S.W.3d 192; *Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595; *Maxwell v. Ark. Dep't of Hum. Servs.*, 90 Ark. App. 223, 205 S.W.3d 801 (2005). Because no specific due-process argument was raised below, this point is not preserved for our review. *See Willis v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842.

B.  Best Interest

In his second point on appeal, Rugama argues that DHS failed to prove that termination was in MC's best interest. As noted above, he does not challenge the court's adoptability or potential-harm findings; therefore, we must affirm those findings. *See Benedict*, *supra*. Instead, he argues that there are other factors, including the effect that termination has on family relationships, that can go into a court's best-interest determination. Because DHS and the circuit court "completely ignored" him, they also "ignored potential relatives and the best interest of his child cannot be said to have been fully considered without any consideration of the impact the termination decision would have on relative relationships."

Our review of the record reveals that the circuit court was presented with testimony that DHS reached out to relatives on both sides. The law is clear that the circuit court is charged with making determinations regarding the credibility of witnesses, and we defer to the circuit court's determinations on appeal. *See, e.g.*, *Thornton v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 13; *Manning v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 565, at 14, ___ S.W.3d ___, ___ ("In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses."). In addition, the court added that if there were relatives on Rugama's side who wished to come forward, it would "certainly take that into account in the future . . . before we do any permanent--permanency or adoption, or anything." Accordingly, we are unable to agree that the circuit court "completely ignored" Rugama's extended family.

Affirmed.

GRUBER and BROWN, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.