Cite as 2025 Ark. App. 162

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-757

| | |
|---|---|
| CHAMACIA ROGERS | Opinion Delivered March 12, 2025 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION |
| V. | [NO.60JV-23-476] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TJUANA BYRD MANNING, JUDGE |
| APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Appellant Chamacia Rogers ("Rogers") appeals from a Pulaski County Circuit Court order terminating her parental rights to her minor child ("MC"). On appeal, Rogers argues the circuit court failed to consider MC's adoptability, therefore, the termination order should be reversed. We affirm the termination of Rogers' parental rights.

On May 9, 2023, the Arkansas Department of Human Services ("DHS") received a hotline report from the father of Rogers's child, Bryan Boles ("Boles"). Boles reported he received a text message from Rogers that she was going to kill their one-year-old child; before initiating a video call where she placed a gun in MC's hand. Boles and his wife, Bianca Boles, picked up MC and took him to Arkansas Children's Hospital where they were met by DHS employees for a family safety assessment. During that assessment, family service worker Pamela Williams was informed that a detective with the North Little Rock Police

Department was bringing Rogers to the hospital. Upon Rogers's arrival, Williams read her the allegations and informed her that a home assessment would need to be completed.

As Williams and Rogers exited the building, Rogers became agitated when she saw Mrs. Boles's vehicle. Rogers ran after the vehicle, jumped on top of it, pulled Mrs. Boles out of the vehicle, and attacked her. Mrs. Boles yelled for help and shouted that Rogers had a gun. Security intervened, and the Little Rock Police Department was called, resulting in criminal charges against Rogers. Following this incident, Rogers and her family began harassing Williams; as a result, Williams obtained a protection order against Rogers.

On May 12, 2023, DHS placed a 72-hour hold on MC and removed him from Rogers's physical and legal custody, with a second 72-hour hold placed on May 15. In making the decision to remove MC, DHS determined Rogers's behavior posed an imminent danger of physical and emotional harm to MC. DHS further determined that an emergency existed, and services could not be provided to prevent MC's removal because both parents (Rogers and Boles) had been detained by the Little Rock Police Department. On May 17, DHS filed a petition for emergency custody and dependency-neglect of MC, and later that day, the circuit court entered an order granting DHS's request for emergency custody.

On May 18, the circuit court held a probable-cause hearing. At the hearing, Williams testified concerning the allegations in the case as well as the incident that occurred at Arkansas Children's Hospital between Rogers and Mrs. Boles. Boles testified next, stating he believes he is MC's father because he was present for MC's birth and had previously attempted to complete paternity testing. Boles confirmed that both he and Rogers had no-

2

contact orders against each other that included MC. Finally, Rogers testified, stating she believed MC would be safe in her custody and that this case was a "set up." The circuit court found probable cause existed for the emergency order to remain in place.

On July 13, the circuit court held an adjudication hearing where it found MC dependent-neglected based on parental unfitness due to Rogers's untreated drug abuse, emotional instability, and incarceration. It also found the allegations in the petition to be true and correct. Additionally, the circuit court set a goal of reunification and ordered DHS to place MC with Boles if it found no concerns with his home. The circuit court ordered that Rogers would be entitled to a minimum of six hours' supervised visitation a week at the DHS office. DHS was ordered to make referrals for Rogers to have individual counseling sessions and anger-management, parenting, and domestic-violence classes. Rogers was additionally ordered to have stable housing and participate in the services referred by DHS.

On October 3, the circuit court held a review hearing where it continued the goal of reunification and continued MC's trial home placement with Boles. The circuit court noted that Rogers was incarcerated and facing serious criminal charges, and should she be released on bond, she was ordered to cooperate and participate in the services referred by DHS. The circuit court additionally noted that Boles had continued his relationship with Rogers—despite being married—and he was potentially the father of Rogers's child that was due in January.

On January 23, 2024, the circuit court held a review hearing where it again continued the goal of reunification. Additionally, the circuit court ordered that the trial home

placement with Boles should continue; however, it found that it still could not award Boles custody because he continued to deny that Rogers had anger issues.

On May 7, the circuit court held a permanency-planning hearing where it changed the goal of the case to adoption due to both parents' continued denial that their toxic relationship placed MC at risk of harm. The circuit court heard testimony that on February 15, 2024, Rogers attempted to run Boles over with her car, and Boles shot a gun at Rogers to scare her away. As a result of this incident, MC's trial home placement with Boles ended. Additionally, Boles testified he believes he is the father of Rogers's new baby, and Rogers testified she had multiple outstanding criminal charges. Rogers was ordered to refrain from making numerous calls and texts to DHS outside business hours and to not be disrespectful or threatening in her communication with DHS. During the hearing, the circuit court had to order that Rogers be removed from the courtroom due to her constant disruption of the proceedings.

On July 9, DHS and the attorney ad litem filed a joint petition to terminate both Rogers's and Boles's parental rights to MC. In their petition, they alleged termination was in MC's best interest due to his adoptability and the potential harm he would suffer if returned to the parents' custody.

On July 31, DHS filed an emergency motion to suspend Rogers's visits with MC due to the following: (1) Rogers physically assaulted DHS employees during a visit; (2) Rogers threatened to physically harm multiple DHS employees during a visit; (3) Rogers cursed at and demeaned DHS staff during a visit after she was asked to turn off inappropriate music;

4

and (4) Rogers attempted to follow the caseworker home and sent the caseworker multiple threatening text messages. Notably, almost all of this occurred in front of MC, and Rogers's harassment resulted in DHS's filing a police report. On August 12, the circuit court denied DHS's motion and found that because Rogers's behavior was against only DHS and not MC, Rogers's visits should continue.

On August 13, the circuit court held a termination-of-parental-rights hearing. Hugo Morais, Ph.D., testified that he is a forensic examiner for the State of Arkansas. In March 2024, he evaluated Rogers to determine her fitness to proceed regarding her five separate pending criminal cases. Dr. Morais testified that Rogers was found fit to proceed because she does not have a mental disease or defect, but he did believe she has an unspecified personality disorder. Dr. Morais testified that Rogers exhibited maladaptive behaviors that cause significant harm to herself and others. He testified there are evidence-based treatments that are effective in changing behaviors over time for those with borderline personality disorders, but that was not Rogers's diagnosis. Dr. Morais noted Rogers was not cooperative during the evaluation and that her demeanor was irritable.

Mahogany Smith, the DHS family service supervisor assigned to the family, testified next. Throughout Smith's testimony, Rogers yelled out repeatedly, cursing and disrupting Smith. Smith recommended termination of parental rights as to both parents. Smith testified about the services provided to Rogers, including a psychological evaluation, parenting classes, individual therapy, and home visits. Smith testified that Rogers completed the psychological evaluation and was starting parenting classes but was discharged from

individual therapy for failure to engage in services. Smith further testified that Rogers was volatile when at the DHS office for her visits with MC and once attempted to follow Smith home. Smith stated she received text messages and voicemails from Rogers with veiled threats and cursing. Smith testified that the potential harm to MC is Rogers's volatility and that she believes MC is adoptable.

Kieanda McFadden, DHS adoption specialist, also testified. McFadden testified she ran a data match regarding MC, and there were 184 possible adoptive families. McFadden testified that MC is "extremely adoptable."

Boles testified next that he lives with his wife and their three children and that he also has two children with Rogers, including MC. Boles claimed he had not seen his new child with Rogers for a while due to the no-contact order between him and Rogers. Boles testified he was concerned Rogers would harm MC and that he could keep MC safe from Rogers.

Finally, Rogers testified. Rogers stated she does not want her parental rights terminated and that she is not a threat to MC. She further testified she is willing to work with Boles and his wife to care for MC and wanted more counseling to "work on herself." Rogers stated MC barely knows her. At the conclusion of the hearing, the court took the case under advisement.

On August 20, 2024, the parties appeared for a hearing on the court's ruling. The court granted DHS's petition as to Rogers but denied it as to Boles. The circuit court stated it would set a permanency-planning hearing for Boles, noting it would need to see a

6

demonstration of Boles's ability to protect MC. Throughout the circuit court's ruling, Rogers yelled out repeatedly, cursed and pounded on the table, and disrupted the court. The circuit court terminated Rogers's parental rights on multiple grounds. Additionally, the circuit court made the following best-interest finding:

> The Court finds that it is in [MC's] best interest that the termination of parental rights petition be granted as to Rogers and finds that he would be at risk of harm from her due to her untreated mental health issues that have resulted in a demonstration of a lack of control and behaviors like the one that caused this case to open as well as other volatile, disruptive behaviors that she has demonstrated throughout this case. Therefore, the Court finds that the termination petition as to Rogers is granted.

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2023). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegations sought to be established. *Posey v. Ark. Dep't of Health & Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, we review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

Rogers does not challenge the circuit court's findings regarding statutory grounds. Thus, we need not consider them. *Benedict v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006); *Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 429, 501 S.W.3d 839. Instead, Rogers challenges the circuit court's best-interest finding, arguing that

7

because the circuit court failed to explicitly address the adoptability factor in its termination order, the order should be reversed. We disagree.

Rogers's argument asks this court to hold that the circuit court was required to make specific adoptability findings in its termination order, but that is not the law. In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the child, taking into consideration (1) the likelihood the child will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). Adoptability is not an essential element; rather, it is a factor the circuit court must consider. *Tucker v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 430, at 7, 389 S.W.3d 1, 4–5. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 781, at 11, 379 S.W.3d 703, 709. The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d.

In support of her argument, Rogers cites *Haynes v. Arkansas Department of Human Services*, 2010 Ark. App. 28. However, Rogers's reliance on *Haynes* is misplaced. In *Haynes*, this court reversed and remanded the circuit court's termination order, finding there was

nothing in the record to demonstrate that the circuit court considered adoptability as part of its best-interest analysis because no evidence of adoptability was introduced at the hearing. *Id.* This is wholly distinguishable from the present case. Unlike in *Haynes*, caseworker Smith presented testimony that MC is adoptable. Further, DHS adoption specialist McFadden testified there were 184 possible adoptive families for MC. The Juvenile Code does not require a "specific quantum" of evidence to support a circuit court's finding regarding adoptability; it requires only that if an adoptability finding is made, evidence must exist to support it. *Cole v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 121, at 5, 543 S.W.3d 540, 543. This court has long held that a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Strickland v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 608, at 10, 567 S.W.3d 870, 876. Therefore, we hold that the circuit court did not clearly err in terminating Rogers's parental rights.

Rogers further argues that because she has custody of MC's younger sister, termination was not in MC's best interest and would interfere with the sibling relationship. This argument is not preserved for appellate review because Rogers did not make this argument at the termination hearing. Even in termination cases, arguments raised for the first time on appeal will not be addressed. *Sills v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 9, 538 S.W.3d 249. Therefore, we hold Rogers's argument on this issue is not preserved for our review.

Affirmed.

KLAPPENBACH, C. J., and WOOD, J., agree.

9

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.